# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE                    NEWS RELEASE #045

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **7th day of September, 2016**, are as follows:

**BY KNOLL, J.**:

2014-KA-1980        STATE OF LOUISIANA v. MARCUS DONTE REED (Parish of Caddo)

Retired Judge Michael Kirby sitting ad hoc for Crichton, J., recused.

For the reasons assigned herein, the defendant's conviction and death sentence are affirmed.  This judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial court shall, upon receiving notice from this Court under La.C.Cr.P. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La .Rev. Stat. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any State post-conviction proceedings, if appropriate, pursuant to its authority under La. Rev. Stat. 15:178; and (2) to litigate expeditiously the claims raised in that application, if filed in the state courts.
AFFIRMED.
HUGHES, J., concurs with the result.

SUPREME COURT OF LOUISIANA

No. 2014-KA-1980

STATE OF LOUISIANA

VERSUS

MARCUS DONTE REED

ON APPEAL

FROM THE FIRST JUDICIAL DISTRICT COURT,
FOR THE PARISH OF CADDO

KNOLL, J.[1]

This case is a direct criminal capital appeal of defendant's conviction and death sentence for the horrific murders of three unarmed young brothers. On November 10, 2010, a Caddo Parish grand jury returned a three count indictment against defendant, Marcus Donte Reed, charging him with the August 16, 2010 first-degree murders of Jeremiah Adams, Jarquis Adams, and Gene Adams in violation of La. Rev. Stat. 14:30. Following five days of jury selection, defendant's guilt phase jury trial commenced on September 28, 2013. At the conclusion of the guilt phase on October 1, 2013, the jury returned a verdict of guilty as charged on all three counts. Following the penalty phase trial, the jury unanimously returned a verdict of death, finding the defendant knowingly created a risk of death or great bodily harm to more than one person. The trial court sentenced defendant to death in accordance with the jury verdict and denied defendant's motion for new trial on January 21, 2014.

This is a direct appeal under La. Const. art. V, §5(D) by the defendant, Marcus Donte Reed. Defendant appeals his conviction and sentence raising 50 assignments of error. We will address the most significant of these assigned errors

---

[1] Retired Judge Michael Kirby sitting ad hoc for Crichton, J., recused.

in this opinion, and the remaining assignments of error will be addressed in an unpublished appendix. We have conducted a thorough review of the record, the law, and the evidence and have found no reversible error. Accordingly, we affirm defendant's first-degree murder convictions and the imposition of the death sentence.

## FACTS

The victims in this case were three brothers. Jeremiah, the oldest of the three, was a handsome 20-year-old, third-semester engineering student at Southern University Shreveport. At 6 feet, 2 inches tall and weighing 205 pounds, Jeremiah was an athlete. While he was in high school, he played football and basketball, and he ran track. He was a father figure to his two younger brothers, Jarquis and Gene, and was an active member of his church where he served as an assistant superintendent, a choir member, and the leader of a little youth group. The day before he died, Jeremiah attended a Sunday afternoon church picnic where he told his great aunt, Clara Adams Morgan, about his plans to assume responsibility for raising his younger brother, Gene, who loved horses and dreamed of being a veterinarian one day. At that time, Gene was living in Shreveport with Bernice Adams, the boys' grandmother and the sister of Clara Morgan. Like the Adams brothers, sisters Clara Morgan and Bernice Adams enjoyed a close relationship, and each helped raise the boys since their births. Although Gene loved his grandmother dearly, he wanted to move out to the country with his great aunt to be with his two older brothers, Jeremiah and Jarquis. Jeremiah was determined to make this dream come true for his little brother. However, as shown by the record evidence, the defendant put an immediate end to all their dreams with his ambush-style killing of the three brothers. On Monday, August 16, 2010, the evening following Jeremiah's heartfelt conversation with his Aunt Clara about Gene, officers with the Caddo Parish Sheriff's Office were dispatched to investigate the

2

reported homicide of *four individuals* at a residence in a rural, heavily wooded area of southwest Caddo Parish, outside Shreveport, Louisiana. There, officers discovered the bullet-riddled bodies of Jeremiah and his younger brothers, Jarquis, who was 18 years of age, and Gene, who had just turned 13 years of age about a month before. Their bodies were found lying in Jeremiah's silver Chevrolet Malibu parked in the front yard of the home where defendant was residing. The windows were completely shot out. Soon thereafter officers discovered a semi-automatic rifle hidden under the front porch of the residence.[2]

At 10:28 p.m., officers were dispatched to the scene following a 9-1-1 call received from James Hendrix. During the guilt phase of defendant's trial, James testified that, at the time of the homicides, he resided, along with his wife, his daughter, and his grandson, across the street from the residence where the brothers' bodies were found. *Shortly after 10 p.m.*, James drove up to his driveway while he was talking on his mobile phone. After exiting his vehicle, he noticed his daughter's boyfriend, Daniel Jackson, running up to the back of his van, "scared to death and crying." According to James, Daniel "had blood on his hands and a little bit of blood on his clothing." After asking Daniel some questions, James took Daniel inside and locked him in the bathroom of the home so that Daniel could clean himself and could hide. James then returned outside with his gun and called 9-1-1. The 9-1-1 calls, which were admitted into evidence at the guilt phase, reflect James notified the authorities that Daniel had told him the defendant, Marcus Reed, had killed *four* people, had "tried to make [Daniel] help him get them in the car," and had threatened to kill Daniel.

Upon their arrival, officers questioned James and then went to the residence across the street from James' home. The scene the officers observed was

---

[2] The report prepared by Carla White, who was accepted at trial as an expert in firearm identification, identifies this weapon as the "7.62X39mm Norinco rifle. model SKS. serial number 25024161."

terrifically gruesome. Officer Matthew Cowden testified that he received the dispatch at *10:28 p.m.* and that he was one of the first officers to arrive at the crime scene. Immediately, he noticed a black male hanging partially out of the driver's side rear door of a silver Chevrolet Malibu. He and two other officers held cover on the house until other responding units arrived. Detective Keith Fox, who led the investigation for the Caddo Parish Sheriff's Office, testified that a stream of gasoline and blood was flowing from the saturated ground around the vehicle down the driveway. Detective Terry Richardson of the Caddo Parish Sheriff's Office also testified that, as he walked down the driveway closer to the scene, he could smell "gasoline, automobile type fluids" and blood, and he observed "a large amount of blood that was actually running in a stream . . . from the car down the driveway towards the street." Detective Richardson recalled that, as he walked closer, he observed

> a gray car with one male partially inside and out of the rear driver's door, and his clothes are pulled down as if he had been dragged either in or out. There's another smaller male deceased in the back seat that had very apparent gunshot wounds. By that time the trunk had already been open to the gray car, and there was a third victim in the trunk.

The photographs admitted into evidence depicting the scene as officers observed it upon their arrival show the male hanging out of the driver's side rear door had a bloodied white cloth covering his face, his genitals were exposed, his left shoe lay on the ground next to his body, the other shoe was on his right foot, his feet alone stretched inside the vehicle, and the rest of his body spread on the ground. At trial, Detective Richardson testified the officers identified this man hanging out of the driver's side rear door as Jeremiah Adams. Detective Richardson testified Gene Adams was identified as the "smaller male deceased in the back seat." According to Detective Richardson, Gene's body "was still sitting somewhat upright, but he was slumped over with just a massive wound down the side of his neck and his face. Also there were fingers that were missing." Indeed, one of Gene's fingers

4

was found in the rear dash next to the vehicle's speakers and behind Gene's head. Although Detective Fox described the yard in which the homicides took place as "very dark" at the time, Detective Richardson explicitly testified the silver Chevrolet Malibu in which the brothers' bodies were found was parked near a light pole which provided enough light to see into the vehicle. Although he could not give an opinion as to whether he could have seen inside the vehicle through its side windows as the windows on the four doors "were all shot out," Detective Richardson said he could see Gene's body looking through the vehicle's undamaged clear front and rear windows without the aid of additional light. Detective Richardson testified Jarquis Adams was identified as the third victim lying face down in the trunk.

Dr. James Traylor conducted the autopsies of Jarquis and Gene. Dr. Traylor testified Jarquis suffered two perforating gunshot wounds: (1) one from a bullet that entered Jarquis' upper right chest and exited his left upper back and (2) the other from a bullet that entered Jarquis' left forehead and exited the back of his head in the right parietal region. According to Dr. Traylor, the pathology of Jarquis' forehead wound was ***consistent with a scenario in which Jarquis was lying on the ground, motionless, while the person stood over him and shot him***. Soot found on Jarquis' skin indicated to Dr. Traylor that ***the muzzle of the gun was within six inches of Jarquis' head*** when the bullet was fired. According to Dr. Traylor, young Gene suffered wounds from as few as two gunshots to as many as five gunshots. Specifically, Gene received a wound on the left side of his face and wounds to his chest and to the left side of his neck. Gene also suffered a traumatic amputation of his right index finger and wounds to his index finger and thumb on his left hand. Dr. Traylor testified that ***it is possible Gene received these hand injuries attempting to shield himself from oncoming bullets***.

Dr. Long Jin, who conducted the autopsy of Jeremiah, testified that Jeremiah

suffered seven separate gunshot wounds, including: (1) a perforating wound that *entered from the back of Jeremiah's head behind his left ear* and exited the right temporal bone of his skull, completely destroying his brain; (2) a penetrating wound to the right neck *that entered from the back of Jeremiah's neck*, struck his right cheekbone, and lodged in the subcutaneous tissue of the right face; (3) a perforating gunshot wound to the right clavicle that exited the right lateral back; (4) a graze wound in his right flank; (5) a penetrating wound from a bullet that *entered in Jeremiah's right lower back* and lodged in his right chest wall; (6) a graze wound in his right mid back; and (7) a graze wound in his right lower back. Jeremiah also suffered chemical burns from gasoline contact on the back side of his body, on the posterior aspect of his extremities, and on his left lower leg, which caused the skin in these areas to "slough off."

Notably, although Dr. Traylor testified that Jarquis had marijuana in his system, in addition to some other prescription drugs, Dr. Traylor and Dr. Jin confirmed that toxicology reports showed neither 13-year-old Gene nor 20-year-old Jeremiah had any *intoxicating substances* in his system. There was "nothing" in their blood.

Lead investigator Detective Fox managed a fast-paced evolving situation immediately following the shootings, gathering evidence at the scene even as officers diligently scoured the rural, heavily wooded area around the crime scene for a potential fourth victim and attempted to identify and to capture the suspect responsible for the carnage. As Detective Fox testified, "It was perpetual motion trying to coordinate where to go first, who to send where." Detective Richardson agreed that it was a dangerous scene and a situation in flux, as officers searched for a fourth individual and an assailant: "Didn't know if someone may have been injured, ran into the woods somewhere." Detective Richardson testified it was not until "some days later or at least a day later" that officers determined as part of the

6

investigation that there was *not* a fourth victim. Meanwhile, members of the Caddo Parish Sherriff's Office Crime Scene Unit, led by Sergeant Gary Baird, meticulously collected evidence in and around the property where the killings occurred, including a semi-automatic rifle **hidden** beneath the north corner of the porch of the residence and a tank top with suspected blood on it that was found inside of an old abandoned school bus parked in the woods on the same side of the house as the place where officers recovered the rifle. At trial, Audra Williams, who was accepted as an expert in the field of DNA analysis, explained the results of a comparison she performed between a known DNA sample from Jeremiah Adams and samples from blood stained portions of the tank top. After obtaining DNA profiles from these samples, Ms. Williams testified the DNA profile obtained from the testing areas on the tank top "was consistent with being a mixture [of DNA from at least two individuals]; one major contributor and at least one minor [contributor]." Ms. Williams determined that the probability that the major contributor of that DNA on the tank top had come from a randomly selected individual other than Jeremiah Adams was one in 533 quadrillion.

Sergeant Baird testified his officers searched the area around the silver Malibu for evidence of ammunition and for weapons. Although a .45 caliber semiautomatic pistol was recovered in the tree line behind the residence, no spent handgun ammunition was found anywhere around the brothers' vehicle or on the porch of the residence.[3] The only ballistics evidence officers recovered around the silver Chevrolet Malibu were several projectiles and shell casings from ammunition of the type commonly fired from a semi-automatic rifle of the kind found hidden under the porch of the Jackson residence. Indeed, Carla White, who

---

[3] Several weapons were recovered in the residence and around the property, including a "handgun revolver" that was found between the mattresses in the room defendant shared with his girlfriend and handgun found underneath the back seat of a black vehicle, belonging to the defendant and his girlfriend, that was parked in the driveway. There was no evidence these firearms were used in the shooting.

was accepted as an expert in the field of firearms identification, testified she positively determined that some of the shell casings and projectiles were fired by the rifle found hidden under the porch, while other projectiles and shell casings she tested had the same class characteristics as other ammunition fired by the hidden semi-automatic rifle.[4] Notably, Ms. White also positively matched two bullets and one bullet jacket recovered *during the victims' autopsies* to this hidden rifle. After executing a search warrant of the residence, officers found, *soaking in the bathtub*, a pair of *yellow plaid shorts*. Inside the pocket of these yellow plaid shorts, officers found a *latex glove*.

Officers identified Marcus Reed as a suspect very quickly, as the first information law enforcement received about this incident from James Hendrix included the report that Marcus Reed was the perpetrator of the shooting. Although officers did not observe defendant on the scene at the time of their arrival, they quickly learned from numerous individuals that Marcus lived, at least intermittently, at the residence where the homicides occurred along with his girlfriend, Loshun Jackson, her two children, and her brother, Daniel. Based on information obtained the morning after the shooting from defendant's cousin, Brian Wafer, officers were able to place defendant at the Jackson residence crime scene during the critical time when they believed the shooting occurred. Brian admitted receiving a call at *10:23 p.m.* from defendant's brother, David Reed, telling him to go pick up the defendant at the home of defendant's girlfriend, Loshun Jackson. At trial, Brian testified he picked the defendant up on the corner near the Jackson residence and recalled seeing police cars toward the house. Brian testified at trial that when defendant entered his vehicle, defendant told him that "he's trying to leave the streets alone and they keep drawing him back in." Brian

---

[4] According to Ms. White, "When I say same class characteristics it means it has a lot of the same type of markings, but I cannot say that it is an identification or it is a match back to the gun . . . . It does not mean that it was fired from this gun and it does not mean that it was not fired from this gun. So it just means it has the same class characteristics as the barrel of this gun."

also reluctantly admitted telling police, the morning after the homicides, that defendant "acted like he was excited" when Brian picked him up on the corner near the crime scene at the Jackson residence that evening. As part of defendant's arrest and booking, Detective Richardson secured the personal effects defendant was wearing on his person at the time of his arrest, including a pair of plaid boxer shorts with suspected blood stains on them. At trial, DNA analysis expert Audra Williams testified she performed a comparison between a known DNA sample from Jeremiah Adams and samples from the blood stained portions of defendant's boxer shorts. After obtaining DNA profiles from these samples, Ms. Williams testified the DNA profile obtained from the testing areas on the boxer shorts "was consistent with being a mixture of DNA from at least two individuals; one major and at least one minor contributor." Ms. Williams determined the probability that the major contributor of that DNA on defendant's boxer shorts had come from a randomly selected individual other than Jeremiah Adams was one in 533 quadrillion.

During the guilt phase, defendant asserted a justifiable homicide defense, arguing Jarquis had burglarized the Jackson residence *earlier in the day* and planned to return that evening to take more things. In support of this theory, defendant called Kyle King, one of two witnesses presented in defendant's guilt phase case-in-chief, who testified he and Jarquis went to the Jackson residence to buy marijuana from the defendant. After the two arrived, Jarquis exited Kyle's vehicle and came back about five minutes later to confer with Kyle. Kyle then drove his vehicle all the way down the driveway to the house and turned it around so it was ready "to leave out." They then entered the house together. While Jarquis "went into the back part of the house," Kyle stayed in the living room and seized two amps and an Xbox 360 game system. Kyle testified that, after he and Jarquis left the home around 12:00 p.m. or 12:30 p.m., Jarquis told Kyle "he wanted to go

back to the house to get some stuff he should have got the first time [they were] there." After this incident, Kyle admitted he and Jarquis spent the rest of the afternoon at his aunt's house "trying to get rid of the stolen stuff." When he left his aunt's house around 4:30 p.m., it was the last time he saw Jarquis.

There was little factual dispute at trial on this score. Every one of the fact witnesses the State offered who spoke to the defendant before the killings or who was present at the Jackson residence that evening testified they learned prior to the homicides that *someone* had broken into the Jackson residence that day. Indeed, Daniel Jackson, who lived at the residence with the defendant, and Bridgette Garland, who spent that evening at the residence, both testified the thief or thieves had stolen marijuana from the Jackson residence, as well.

Among the twenty-one witnesses the State presented during the guilt phase were two eyewitnesses, Daniel Jackson and Shannon Garland.[5] Daniel Jackson lived at the Jackson residence with his sister Loshun, the defendant, and Loshun's two children. It was Daniel's frantic report of the killings to James Hendrix that precipitated the 9-1-1 call that dispatched officers to the Jackson residence. At trial, Daniel recalled that, when the defendant initially learned about the theft from his home, defendant and Loshun confronted Daniel and accused Daniel of stealing the items. Eventually, they accepted that he did not steal the items. When asked whether defendant made any effort to try to find out who did steal the items, Daniel responded, "He made some calls to my cousin and my grandma [sic] house," though Daniel was not exactly certain *to whom* defendant spoke or what he said. Daniel perceived that defendant was angry about the theft "[c]ause he was pacing around on the phone like – you could just tell he was hot about his stuff came [sic] up missing." That evening, Daniel testified, the only individuals who

---

[5] This summation of the facts does not detail the testimony of every one of the State's witnesses. Rather, we focus solely on those witnesses whose testimonies we believe were most critical to the jury's determination that defendant was guilty of three counts of first-degree murder.

remained at the Jackson residence were Loshun, the defendant, Daniel's friend Shannon Garland, and Shannon's wife, Bridgette Garland. Before the shooting, as it was getting dark, Daniel overheard the defendant call an unknown person and say, "You need to come home and get your package cause I'm fixing to go." According to Daniel, this conversation was heated and, during its course, defendant asked the unknown person whether "he see anybody over here earlier that day." Daniel testified that sometime thereafter he was outside working on the sound system in his car with Shannon. Loshun and Bridgette left in Shannon's truck to go buy some beer and, as they pulled out of the driveway, Shannon realized he had forgotten to give them money for the beer so he ran down the driveway and tried to chase the truck. According to Daniel, Shannon had returned to his side and was helping him with the sound system in his trunk when a gray car pulled up into the driveway. Although it was dark, Daniel confirmed that the light pole in the yard provided enough light for him to see. Daniel testified that a man, who Daniel later learned to be Jarquis, "hopped out" of the front passenger side of the gray car and said, "Where Marc at?" According to Daniel, defendant said, "hey," and then ***started shooting from the woods with a long rifle at the man***. Daniel identified the semi-automatic rifle officers recovered hidden under the porch as the firearm defendant used, and he specifically recalled that defendant was wearing ***latex gloves***—like the one found in the pocket of the yellow plaid shorts soaking in the Jackson residence bathtub—when he emerged from the woods shooting. Daniel testified he never saw Jarquis with a weapon, never saw Jarquis motion toward the defendant like he was going to attack him, and never saw Jarquis threaten the defendant with words. Although Daniel specifically remembered defendant shot Jarquis "[t]wice in all," he could not determine how many times defendant fired the semi-automatic rifle into the gray vehicle. After the defendant shot Jarquis the first time,

He walked up to the car and, from the passenger – passenger side back seat, shot into the window; walked around and shot into the other window. ***Walked around the car shooting***.

(Emphasis added). Daniel testified the defendant was aiming the rifle with each shot. According to Daniel, after circling the vehicle, the defendant came back around to the front of the vehicle where Jarquis was ***laying on his back motionless*** and shot Jarquis in the forehead. Thereafter, Daniel testified, defendant "pointed the gun at me and Shannon and wanted us to put – help him with the persons, putting them back in the car." Daniel recalled that defendant declared "[they] better help him move it or [they] were going to be next." Although he explicitly denied helping to move a body into the trunk, Daniel testified that he and Shannon then helped move the body of "[t]he one that was leaning out the…***left side back seat***" of the gray vehicle. (Emphasis added). According to Daniel, Jeremiah's body was "so big," even Daniel, Shannon, and the defendant together were unable to move it out of the vehicle. Significantly, Dr. Jin, who performed Jeremiah's autopsy, corroborated this fact, testifying that Jeremiah was six feet, two inches tall and weighed 205 pounds at the time of his death. In the process of trying to move Jeremiah's body, Daniel testified he got blood on his person, his clothes, and his shoes.

On cross-examination, defense counsel elicited testimony from Daniel that he saw two bodies in the back seat, that he never saw anyone exit the driver's side front seat, and that he did not see where the person in the front seat went. Daniel also denied helping to move Jarquis' body into the trunk and testified he did not know who placed Jarquis' body in the trunk. At times, Daniel's testimony was internally inconsistent. On his first day of testimony, Daniel testified on direct examination that he did not see what defendant did with the rifle and that defendant "kept it with him when the shooting stopped." On cross-examination the next day, Daniel testified that, when James Hendrix pulled into the driveway

12

across the street, defendant "put the gun down and ran." At this point, Daniel ran toward James, who made the initial 9-1-1 report. Defense counsel cross-examined Daniel vigorously on various inconsistencies between the statements Daniel initially gave to officers and his testimony before the court, including his original statement that he was inside his car listening to music when the shooting happened. Although Daniel acknowledged that he initially reported to police that four people had been in the car, Daniel explained that he could not tell how many people were in the gray vehicle when it pulled into the driveway. He also testified that he told James that four individuals had been killed because, when he did not see Shannon run away at the same time that he did, he thought the defendant had shot Shannon. Finally, defense counsel cross-examined Daniel thoroughly on Daniel's initial failure to reveal to police that Shannon was present when the homicides occurred. Daniel admitted that he was untruthful with the officers that night because he was "scared": "Three people got killed right in front of me." Elsewhere in his testimony, Daniel explained he did not tell officers everything he knew that evening: "I was scared and I thinking [sic] that [defendant] was going to try to come and finish me and Shannon."

The trial testimony of the second eyewitness, Shannon Garland, corroborated Daniel's testimony in all *significant* respects related to *defendant's actions before, during, and after the shooting*. According to Shannon, when Bridgette and Loshun left together in Shannon's truck to buy beer, Shannon chased the truck down the driveway to the road because he had left his can of tobacco in the truck. When Shannon reached the road, he noticed a car coming. Shannon testified this car pulled into the driveway, and he began walking up the driveway behind the vehicle. Shannon recalled that he watched as a man exited the front passenger side of the vehicle. Shannon testified that this man who did not look threatening or seem upset "just walked towards me and started talking, wanted to

13

talk to me." When asked whether he remembered if the man said anything, Shannon responded, "He never got it out . . . . That's when Marcus shot him." According to Shannon, the defendant emerged from the woods, shot the man, and said, "I got you." Shannon identified the semi-automatic rifle officers recovered hidden under the front porch as the firearm defendant used in the shooting. Shannon also testified that defendant wore "some plaided, some colorful shorts" at the time of the shooting. When shown a picture of the *yellow plaid shorts* officers found soaking in the bathroom of the Jackson residence with a *latex glove* in its pocket, Shannon positively identified those shorts as the ones defendant wore that night. Shannon recalled, "When [the defendant] shot [the front passenger], [the front passenger] held his arms out and went to put his arms on my shoulder. And he wanted to say something, but he couldn't say nothing. It wouldn't come out." The defendant then "walked around the car shooting the car . . . . kind of like a video game." Like Daniel, Shannon testified that defendant "started at the back of the car and he *walked around it clockwise shooting it up.*" (Emphasis added.) Shooting into the windows, defendant fired "[t]oo many [bullets] to count." After making his way around the front driver's side, defendant shot the front passenger, the initial victim, again while the victim lay on the ground. According to Shannon, defendant shot the front passenger three times: first, in the back, while Shannon was standing directly in front of the victim; second, in the chest, while the victim lay on the ground; and third, in the head, while the victim lay on the ground.

Although he remembered that Daniel was "standing there on the steps" during the shooting, Shannon testified he was focused on the defendant and that he was not able to tell what Daniel was doing at the time because he was scared: "I didn't know if he was going to shoot me or not." According to Shannon, defendant then "had the gun in his hand and he told us – he pointed the gun over at us and said put the body in the trunk." Unlike Daniel, who only testified to attempting and

failing to move ***Jeremiah's body*** which officers found hanging out of the driver's side rear door, Shannon remembered complying with defendant's order that he and Daniel move the body of the man who was shot first and last—that is, ***Jarquis' body***—into **the trunk**, where officers later found it. According to Shannon, defendant then pulled the driver's body out of the front driver's seat and told Daniel and Shannon to "try to pick him up and put him in the trunk." Consistent with the testimony provided by Daniel and by Dr. Jin, Shannon testified that he and Daniel tried to pick Jeremiah's body up, but it was too heavy. Shannon specifically recalled the man's pants "com[ing] down" as they tried to pull his body. Significantly, this description of Jeremiah's body corresponds to the condition in which officers discovered the body when they arrived at the scene. Shannon testified that defendant then went up on the steps of the house and that Daniel, who was "[a]cting scared," ran away when he saw Marcus ascended the steps: "He took off running and left me standing there." When Shannon realized defendant had gone into the house and left him standing there alone, Shannon "seen a chance" and ran home. Shannon testified that when he arrived at his home, he locked himself in his bedroom: "I laid there and cried, scared. Didn't know what to say, didn't know what to do. Didn't want to talk to nobody." Although Shannon acknowledged he initially told police officers there were four to five individuals in the gray car when it pulled up to the Jackson residence, Shannon explained,

> I was confused at the time. There was a lot going on. I didn't remember exactly. I didn't know everything at the time . . . . I was so scared. I mean I didn't know what to say. I was so scared. I mean, I didn't know everything at the time.

During a vigorous cross-examination, Shannon testified he did not remember telling officers that "there were a bunch of people there" at the time of the shooting or that he did not make it up the driveway before the shooting began. Even when

speaking with officers, Shannon maintained he remained frightened: "I didn't know if – I didn't know if Marcus was going to come back and get us or not at the time. I didn't know what – if he was still out or if he was still walking free."

The only testimony offered that cast any doubt on the essential facts to which Daniel and Shannon testified came from a witness who admittedly did not *see* any of the events as they transpired. Clarence Powell, Loshun Jackson's cousin, testified that, on the evening of the homicides, he was visiting his parents' home, located about 20 yards from the Jackson residence. Clarence testified he was moving back and forth between his parents' porch and the kitchen of their home when he *heard* a confrontation and then, within a minute or two later, gunshots from *two different guns*, first from a *handgun* and then from *a rifle*. Because Clarence was reluctant to use profanity in front of the jury, defense counsel, Richard Goorley, read to the jury the statement Clarence made to officers the day after the shooting about the confrontation he allegedly heard:

Q. Talking about the car drove up.

A. Uh-huh.

Q. And you said, I heard him say – that's Marcus, right –

A. Yes.

Q. – I told you don't come down here. Don't fuck with me. Don't fuck with me. And then somebody else, a voice I don't recognize, Motherfucker, I told you, I told you, you ain't shit. You ain't shit. And then I heard a man say, Get the fuck away from here; I'm telling y'all I'm telling y'all just leave me alone.

That was Marcus, right –

A. Yes.

Q. – said leave me alone. It was the other guy saying, You ain't shit, right?

A. Yes.

Q. Mr. Reed turned to walk off. The guy says, Don't turn your back on me, you bitch ass nigger. Marcus says, Man, I told you don't come

to my house. Don't come to my house. I beg don't come to my house.

And then later you said, Mr. Reed said I told y'all, I'm telling y'all. And the guy, Don't turn your back on me here, you punk ass nigger, you punk ass nigger.

That was the other person talking to Mr. Reed, right?

A. Right.

Q. Don't turn your back on me.

A. Yes.

Q. Then you heard someone say gun?

A. Yes.

Q. And then you heard two pistol shots and a bunch of rifle shots?

A. I don't know how many pistol shots. I just heard a pistol and a rifle.

Although Clarence insisted he heard the reports of two *different* types of firearms, officers found *no evidence*—no spent shell casings from a semiautomatic handgun, no weapons in the Adams brothers' vehicle, no revolver to which someone in the gray vehicle may have had access—that any firearm other than the semi-automatic rifle identified by Shannon and Daniel and hidden under the front porch of the Jackson residence was used in the shooting. Aside from the absence of physical evidence to support Clarence's version of events, the jury had other reasons to doubt Clarence's credibility. Indeed, concerning the confrontation Clarence allegedly heard, the State impeached Clarence with a later statement Clarence gave to police officers. Officers asked Clarence, "Do you hear any yelling, screaming, or just nothing but the sound of gunshots?" Clarence responded, "[A]ll I heard before the gunshots, people talking." Moreover, although Clarence testified at trial that defendant was "[n]owhere near" the abandoned school bus in the woods in which officers later found the tank top stained with Jeremiah's blood, the State impeached Clarence with his prior statement to officers that defendant "came out

of the woods by the bus" wearing *"bright yellow" shorts*. The State also elicited testimony from Clarence that he worked out of state, that his mother still lived next door to the Jackson residence, and that he worried about her safety and the safety of his brother and his sister.

The testimony of other witnesses who were present at the Jackson residence prior to the shootings also corroborated the version of events described by Daniel and Shannon. Shannon Garland's then-wife, Bridgette Garland, was also present at the Jackson residence on the night of the homicides. At trial, Bridgette testified she remembered defendant saying that someone had taken an amplifier, an Xbox, and marijuana from the Jackson residence. Bridgette recalled defendant was making phone calls in an effort to try to determine who had stolen his things. Bridgette remembered overhearing a phone call in which defendant told a person whose nickname was "Radio" "to come back over, that he had a package for them to come pick up and get here before he ran out." By "package," Bridgette understood that defendant was referring to marijuana. Bridgette testified that, after this conversation ended, defendant spoke about the burglars and "said that whenever they come . . . he was going to kill them and whoever was with them; he didn't care." Bridgette recalled defendant went into the house and brought back onto the porch a "long black [gun] and it had like a round clip from the bottom." Bridgette positively identified the rifle officers had found hidden under the porch as the gun defendant had with him. Bridgette also testified that defendant brought out white *latex gloves* from the house and that she watched defendant put these gloves on his hands. Bridgette further confirmed the glove found in the pocket of the *yellow plaid shorts* soaking in the bathroom of the Jackson residence was the same type of glove she saw defendant wearing that evening. After putting the gloves on his hands, defendant "walked around in the yard" and then later "hid in the woods" with the gun. Bridgette described defendant's demeanor at this point as "angry."

18

Shortly thereafter, Bridgette left the house—on the pretext of purchasing more beer with defendant's girlfriend, Loshun—because she was "scared" of the defendant: "His anger, he was hostile, and he was talking about killing people, so I wanted to get out of there." By the time Loshun and Bridgette left the Jackson residence, defendant had come out of the woods but he no longer had the rifle with him. Bridgette testified that, after purchasing beer, her truck ran out of gas on the way back to the Jackson residence, and she and Loshun started walking on foot back toward the house. Bridgette recalled that, during this trek, she received a call on her cell phone from defendant who asked to speak to Loshun. Because her phone would only work on speaker phone at the time, Bridgette clearly overheard defendant tell Loshun that "he needed help getting all the bodies out of his yard." Like Daniel and Shannon, after a vigorous cross-examination by defense counsel, Bridgette admitted that initially she was not completely truthful in her statements to officers or in her grand jury testimony because she was afraid for her life. Bridgette further testified defendant's brother, David Reed, called about a week after the shooting, threatening he would "blow up [hers and Shannon's] house" if she and Shannon testified against the defendant. Significantly, Bridgette's statement received independent corroboration through the guilt phase testimony of Corporal Dexter White. Indeed, during Bridgette's testimony, she related that, while she and Loshun walked home, a police officer saw them, stopped his vehicle, and offered them a ride home. The women accepted his offer and directed him to take them to Bridgette's house. The deputy told them he could not take them all the way to their destination because "an incident happened and he had to get to it immediately." Bridgette testified he dropped them off at "Pecan Road." According to Bridgette, while she and Loshun were in the police vehicle, she heard over the police radio that there had been a shooting in the vicinity of the Jackson residence. At trial, Corporal White testified, that just prior to his arrival at the crime scene, he

observed two women as they walked down the road. The women explained to him that their truck had broken down, and he dropped them off at "Pecan Farms" before he proceeded to the crime scene.

After hearing this testimony along with the testimony of several other witnesses and considering all of the evidence, a unanimous jury found defendant guilty of the first-degree murders of Jeremiah, Jarquis, and Gene Adams and determined defendant should be sentenced to death as punishment for these crimes.

Having carefully studied the entire record, we note the evidence of the homicide is not seriously in dispute. The dispositive issue turns purely on a credibility determination—was the defendant justified in killing the three brothers. The defendant rests primarily on the inconsistencies between the witnesses' statements to law enforcement officers and their testimonies at trial to support his argument of insufficient evidence to prove he was not justified in killing Jeremiah, Jarquis, and Gene Adams. As will be detailed below, we have carefully examined all of defendant's assignments of error and find them meritless.

## ASSIGNMENTS OF ERROR

### Sufficiency of the Evidence

#### Assignment of Error 36

Defendant argues the State presented insufficient evidence to support a conviction for first-degree murder and the imposition of a death sentence. Specifically, defendant contends (1) the State presented insufficient evidence to prove beyond a reasonable doubt that the homicides were not justified; (2) the State's evidence was insufficient to support a verdict of first-degree murder; and (3) the unreliability of the State's witnesses precludes a conviction for first-degree murder and the imposition of the death penalty.

In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United

States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *State v. Captville*, 448 So.2d 676, 678 (La. 1984). Applying the *Jackson* standard, the appellate court must determine the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Captville*, 448 So.2d at 678.

To obtain a conviction for first-degree murder in this case, the State was required to prove beyond a reasonable doubt that defendant killed a human being when he had the specific intent to kill or to inflict great bodily harm upon more than one person. La. Rev. Stat. 14:30(A)(3). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. La. Rev. Stat. 14:10(1); *State v. Butler*, 322 So.2d 189, 192-93 (La. 1975). Specific intent to kill may also be inferred from a defendant's act of pointing a gun and firing at a person. *State v. Williams*, 383 So.2d 369, 373 (La. 1980); *State v. Procell*, 365 So.2d 484, 492 (La. 1978).

As to the issue of justifiable homicide, when the defendant asserts he acted in self-defense, the State bears the burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense. *State v. Taylor*, 02-1834, p. 7 (La. 5/25/04), 875 So.2d 58, 63; *State v. Brown*, 414 So.2d 726, 728 (La. 1982). A homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La. Rev. Stat. 14:20(A)(1); *State v. Guinn*, 319 So.2d 407, 408-09 (La. 1975).[6] However, an aggressor may not claim self-defense without showing he first withdrew from the conflict in good faith and in such a manner that his adversary knew or should have

---

[6] Because defendant only requested jury instructions under La. Rev. Stat. 14:20(A)(1), we do not address La. Rev. Stat. 14:20(A)(2) and (3) (the "stand your ground" defenses).

known of his intention to withdraw and discontinue the conflict. *See* La. Rev. Stat. 14:21.

Although defendant admits there was "clearly" sufficient evidence that he shot Jeremiah, Jarquis, and Gene, defendant contends there was not sufficient evidence to prove beyond a reasonable doubt that the killings were not justified. We disagree. The eyewitness testimony of Daniel Jackson and Shannon Garland established defendant emerged from the darkness of the woods shooting at Jarquis, who was not carrying a weapon and who did not threaten or attack the defendant. Indeed, based on the eyewitness testimony, ***at most***, Jarquis was able to inquire, "Where Marc at?" before the defendant began shooting at him. Both Daniel and Shannon testified defendant then proceeded clockwise around the vehicle, shooting out the windows in the process, as he savagely and without provocation killed 13-year-old Gene and oldest brother Jeremiah before completing his circuit by again shooting a motionless Jarquis in the head as he lay on the ground. Daniel's testimony that defendant was wearing latex gloves while he shot the three victims—corroborated by Bridgette Garland's testimony that she saw defendant put on latex gloves before walking off into the woods with the semi-automatic rifle he used to kill the brothers and by the officers' recovery of a latex glove inside the pocket of the shorts multiple witnesses testified the defendant was wearing at the time of the homicides, found soaking in a bathtub in the residence where defendant lived—leads to the inevitable conclusion that defendant's decision to kill Jarquis Adams and "whoever was with [him]" was premeditated and cold-blooded. Daniel's and Bridgette's testimony that defendant made phone calls during that afternoon in an attempt to identify the perpetrator of the burglary and Bridgette's testimony defendant ended a phone call directing a person to come over to pick up a "package" and then expressed to Bridgette his desire to "kill them and whoever was with them" further buttress this conclusion, as does the evidence the State

presented that defendant tried to conceal the murder weapon, hide the victims' bodies, and destroy additional evidence by washing his clothing before ultimately fleeing the bloodied killing scene.

Defendant relies heavily on the testimonies of Kyle King and Clarence Powell to support his argument that Jarquis returned to the Jackson residence to steal more items and that defendant acted based on a reasonable belief that he was in imminent danger. The jury, however, evidently made a credibility determination and rejected defendant's theory of justifiable homicide. Indeed, contrary to Clarence Powell's testimony that he heard the report of a *handgun* followed by several *rifle* gunshots, no evidence was ever found to support the theory that someone in the Adams brothers' vehicle fired a *handgun* at defendant that evening. Eyewitnesses denied seeing any weapons other than the semi-automatic rifle wielded by the defendant, and crime scene investigators did not find any handgun or handgun ammunition in or around the brothers' vehicle. Even excluding the ample testimony of fact witnesses, we find the autopsy results— including (1) Dr. Traylor's testimony concerning the defensive wounds to Gene's hands and the pathology of the wound to Jarquis' forehead which was consistent with the eyewitness testimony that defendant shot Jarquis in the head at close range as he lay on the ground motionless after already having been shot in the chest and (2) Dr. Jin's testimony that three of Jeremiah's wounds entered through the *back* of his body—preclude any reasonable inference defendant acted in self-defense when he killed the Adams brothers. Based upon the copious testimony and evidence presented by the State, a rational trier of fact could have soundly concluded that defendant did not have a reasonable fear for his life. This claim is meritless.

### *Assignment of Error 37*

In a similar vein, defendant argues, even if the jury rejected the testimony of Clarence Powell and Kyle King and accepted the testimony of Daniel Jackson and

Shannon Garland, the evidence presented at trial made out a case for manslaughter, not murder. We disagree. Under La. Rev. Stat. 14:31(A)(1), manslaughter is a homicide which would either be first or second degree murder but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his cool reflection and self-control. The elements of "sudden passion" and "heat of blood" are mitigating factors in the nature of a defense and, when such factors are established by a preponderance of the evidence, a verdict for murder is inappropriate. La. Rev. Stat. 14:31(A)(1); *State v. Lombard*, 486 So.2d 106, 110-11 (La. 1986); *State v. Tompkins*, 403 So.2d 644, 648 (La. 1981). Provocation and time for cooling off are questions for the jury to be determined under the standard of the average or ordinary person, one with ordinary self-control. *See* Reporter's Comment to La. Rev. Stat. 14:31; *State v. Walker*, 50 La. Ann. 420, 422, 23 So. 967 (1898).

Although Daniel and Shannon both testified about how quickly the shooting itself occurred, the testimony established that almost 10 hours elapsed between the burglary and the shooting. While the defendant had a significant amount of time to cool off prior to the homicides, the evidence established defendant spent this period of time attempting to identify the burglars and preparing to exact his revenge by ambush. Daniel Jackson's eyewitness testimony that defendant was wearing latex gloves at the time of the shooting, Bridgette Garland's testimony that she saw defendant don latex gloves before entering the woods with the semi-automatic rifle, and the recovery of a latex glove in the shorts witnesses say defendant wore that evening further support the jury's conclusion that defendant acted not in the heat of "sudden passion," but in cold blood. Although Clarence Powell's testimony about what he allegedly *heard* could have suggested some kind of confrontation occurred prior to the shooting, the jury evidently chose to credit the *eyewitness* testimony of Daniel Jackson and Shannon Garland who testified,

24

consistent with the physical evidence, that the victims were unarmed and that they did not exhibit any provocative or aggressive action toward defendant. A rational trier of fact could have soundly concluded defendant failed to establish the requisite mitigating factors by a preponderance of the evidence to prove manslaughter. This claim fails.

### *Assignment of Error 38*

In his final assignment of error related to the sufficiency of the evidence, defendant argues the unreliability of the State's witnesses precludes a conviction for first-degree murder and the imposition of the death penalty. First, defendant points to several inconsistencies in Shannon Garland's and Daniel Jackson's testimonies. Essentially, Shannon's account of events diverges from Daniel's account with respect to where in the yard *he and Daniel* were situated at the time of the shooting. Likewise, Daniel provides a different account as to where precisely *he and Shannon* stood at the time of the homicides. Significantly, however, both men provide *substantially the same account of defendant's actions* at the time of the homicides. Indeed, both men recall defendant emerging from the darkness of the woods and shooting an unarmed, unthreatening Jarquis. Both men testified defendant then walked clockwise around the vehicle beginning with the back passenger side, shooting out the windows and killing the other two brothers in the vehicle. Consistent with the autopsy results, both witnesses reported that defendant shot a motionless Jarquis in the head as he lay on the ground, after defendant had already shot him in the chest. Given how quickly the shootings occurred and how intensely violent they were, it is of little surprise and of less significance that Daniel and Shannon had difficulty remembering the precise vantage point from which they witnessed this sudden, violent, and unprovoked carnage.

Defendant also argues Shannon's testimony could not be credited because

Shannon testified defendant first shot Jarquis in the back as Jarquis stood directly in front of Shannon, yet autopsy results show Jarquis was shot in the upper right chest. Although Dr. Traylor testified Jarquis was not shot in the back, he also testified, based upon the angle at which the bullet entered the victim's upper right chest, he could not exclude the possibility that Jarquis was shot as he turned to his right to face the muzzle end of the weapon. Given this testimony, we find the autopsy results do not necessarily contradict Shannon's testimony.

Defendant next contends no rational juror could credit the testimony of Shannon Garland, Daniel Jackson, and Bridgette Garland given inconsistencies between their trial testimony and various pre-trial statements they made to officers and to the grand jury. Defense counsel thoroughly and vigorously cross-examined these witnesses and fully explored for jurors the inconsistences in their prior statements and testimony. Specifically, concerning the possibility of a fourth victim, Shannon and Daniel both admitted they initially informed police that more than three people were in the vehicle. Shannon testified to being confused and scared during his questioning following the shooting. Multiple witnesses testified to Daniel's hysterical demeanor after the homicides, with Detective Cowden, one of the first officers on the scene, describing Daniel as "very afraid, very scared . . . very disturbed, very upset." Daniel testified his report that four individuals were killed was based on his fear defendant had killed Shannon, as well. Notably, all three of these witnesses testified to their fear of retribution from the defendant or from his family if they told officers everything they knew, with Bridgette specifically alleging she received a phone call from defendant's brother who threatened he would "blow up [hers and Shannon's] house" if she testified against the defendant. Notwithstanding the discrepancies clearly brought out through cross-examination, the inconsistences did little to discredit their testimony at trial about defendant's motive, preparation, and execution of these three killings. When

there is conflicting testimony as to factual matters, the resolution of which depends on witness credibility, a matter of weight of evidence rather than its sufficiency is presented. *Tibbs v. Florida*, 457 U.S. 31, 46, 102 S.Ct. 2211, 2220-21, 72 L.Ed.2d 652 (1982) ("This resolution of conflicting testimony in a manner contrary to the jury's verdict is a hallmark of review based on evidentiary weight, not evidentiary sufficiency."). In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. *State v. Higgins*, 03-1980, p. 6 (La. 4/1/05), 898 So.2d 1219, 1226. Credibility determinations are within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence. *State v. Marshall*, 04-3139, p. 9 (La. 11/29/06), 943 So.2d 362, 369. In this case, there were inconsistencies among the testimonies of various witnesses regarding factual matters, so the issue was the weight of the evidence and not its sufficiency. As such, it was within the jury's discretion to accept the State's witnesses and find the defendant guilty of three counts of first-degree murder. Because the jury's credibility determinations in this case were not clearly contrary to the evidence and, indeed, were amply supported by the evidence, we find no error in the jury's decision to credit the testimony of these witnesses.

Defendant further argues the testimony of Glen Merrell, another witness for the State, contradicted Shannon's and Daniel's accounts, rendering their eyewitness accounts unreliable. Glen testified that he was on the phone with defendant around the time of the shootings, that defendant asked him to "hang on for a minute," and that Glen then heard "a bunch of gunshots." Defendant argues this testimony undermines Shannon's and Daniel's testimonies because neither testified to seeing defendant on the phone as he came out of the woods. This contention is meritless. We fail to see how Glen's waiting "for a minute" on the phone while the homicides occurred contradicted the eyewitnesses' accounts of the

27

shooting.

Lastly, defendant maintains no rational juror could rely on the testimony of former inmate Terry Matthews, who testified during the guilt phase that, while at Caddo Correctional Center together, defendant confessed to Terry that "he laid and waited and ran out and ambushed" the Adams brothers. Defendant argues Terry's account is incredible (1) because he was formerly terminated as a confidential informant for the Caddo Parish Sheriff's Office for being a high risk, heavy drug user who was "spreading his information on the street," (2) because the testimony of inmate Robert Washington contradicted Terry's testimony, and (3) because he testified inconsistently concerning whether or not he spoke to, and obtained information from, his wife about defendant's case. After reviewing Terry's testimony, we believe a rational juror could have found his testimony to be credible. Indeed, the jury heard from Terry that he provided this information to officers days before his release on a conviction for "simple burglary or burglary" because he "[f]elt it was the right thing to do." By the time of his testimony, Terry remained on probation but had been employed for two years, he traveled from out of state to provide his testimony, and he was a married father of two daughters with one child on the way. Although Robert Washington, who at the time of trial remained jailed at Caddo Correctional Center on convictions for forcible rape of a child and second degree kidnapping of that same child, testified that he was present at all times during which Terry claimed to have received this confession from defendant and that he never heard defendant discuss his capital case, it was within the jury's discretion to determine what weight to assign to each witnesses' testimony. Finally, defendant strenuously argues Terry's statement to officers was inconsistent with his trial testimony because, contrary to his original statement in which he mentioned speaking with his "wife" about the shooting, Terry denied speaking with anyone about defendant's case. Defense counsel cross-examined

Terry thoroughly on this point. Given the testimony Terry offered was fully consistent with the eyewitness testimony of Daniel Jackson and Shannon Garland, a rational juror could have found Terry's testimony to be credible. Accordingly, we find this assignment meritless, as well.

### *Jury Instructions*

#### *Assignments of Error 8 through 11*

Defendant argues that the trial court failed to instruct the jury on the elements of justifiable homicide applicable to his case, La. Rev. Stat. 14:20(A)(2) and (3) and erroneously instructed jurors to consider the possibility of retreat contrary to La. Rev. Stat. 14:20(D). In defendant's "Request and Order for Written Jury Charges and Instructions," he requested the following instructions on justifiable homicide and retreat in pertinent part:

> A homicide is justifiable if committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
>
> The danger need not have been real, as long as the defendant reasonably believed that he was in actual danger.
>
> There are several factors that you should consider in determining whether Mr. Reed had a reasonable belief that the killing was necessary to save himself from that danger:
>
> (1) the possibility of avoiding the necessity of taking human life by making a safe retreat, provided however, that a person who is not engaged in any unlawful activity and is in a place where he has a right to be has no duty to retreat before using deadly force to save himself from the danger of losing his life or receiving great bodily harm. He may stand his ground and meet force with force . . . .

These requested instructions on justifiable homicide reflect only the provision of La. Rev. Stat. 14:20(A)(1) and, along with the instruction on retreat, also mirror the instructions that were provided to the jury at the conclusion of the guilt phase of trial. As such, it appears defense counsel did not request the inclusion of the "stand your ground" provisions under La. Rev. Stat. 14:20(A)(2),

(A)(3), or (D). Indeed, defense counsel requested the very instructions to which defendant now objects. Thus, there exists no error for this Court to review. La.C.Cr.P. art. 807; *State v. Rayford*, 348 So.2d 990, 990 (La. 1977). Further, defense counsel voiced no objection to the court's jury instructions during the guilt phase. Accordingly, these assignments of error were not preserved for appellate review. La.C.Cr.P. art. 841; *State v. Wessinger*, 98-1234, pp. 19-20 (La. 5/28/99), 736 So.2d 162, 180-81 (scope of review in capital cases is limited to alleged errors to which counsel contemporaneously objects).

### *Assignment of Error 12*

Defendant also claims trial counsel rendered ineffective assistance by failing to request jury instructions on justifiable homicide under La. Rev. Stat. 14:20(A)(2) and (3) and by requesting an instruction directing the jury to consider the possibility of retreat contrary to La. Rev. Stat. 14:20(D).

Under the standard for ineffective assistance of counsel set out in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), adopted by this Court in *State v. Washington*, 491 So.2d 1337, 1338-39 (La. 1986), a reviewing court must reverse a conviction if the defendant establishes (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's inadequate performance prejudiced defendant to the extent that the trial was rendered unfair and the verdict suspect. Generally, a claim for ineffective assistance of counsel is properly raised in an application for post-conviction relief. *State v. Burkhalter*, 428 So.2d 449, 456 (La. 1983). This enables the district judge to conduct a full evidentiary hearing on the matter. *State v. Seiss*, 428 So.2d 444, 449 (La. 1983). Because the record in this case discloses the evidence needed to decide the issue of ineffective assistance of counsel and because defendant has raised the issue by assignment of error on

appeal, we will address the issue now in the interest of judicial economy. *See, e.g.*, *State v. Ratcliff*, 416 So.2d 528, 530-32 (La. 1982).

Here, despite appellate counsel's claim to the contrary, a review of the record does not reveal trial counsel rendered constitutionally deficient assistance. Defense counsel arguably made a *professional* error by failing to request instructions under La. Rev. Stat. 14:20 (A)(2), (A)(3), and (D), as the defense theorized at trial that Jarquis Adams returned to defendant's residence with the intent to further burglarize defendant's home and that defendant had a reasonable belief the use of deadly force was necessary to prevent a violent or forcible felony. Even assuming error on the part of trial counsel, given the evidence presented by the State thoroughly and overwhelmingly discredited defendant's self-defense theory, defendant fails to show any resulting prejudice from trial counsel's failure to request the jury instructions at issue. Thus, counsel's errors in failing to request additional jury instructions on justifiable homicide and in requesting an instruction concerning the possibility of retreat do not undermine confidence in the verdict returned by the jury. Thus, it cannot be said defendant's conviction and death sentence resulted from a breakdown in the adversarial process that renders the result unreliable. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. Accordingly, this claim fails.

### *Prosecutorial Misconduct*

Defendant argues that prosecutors' conduct at various points throughout the guilt and the penalty phases of defendant's capital trial, both individually and collectively, violated his constitutional rights to due process, a fair trial, and a reliable sentencing proceeding.

### *Assignments of Error 19 through 21*

Three of the five assignments of error concerning this asserted prosecutorial misconduct involve statements prosecutors made during the guilt and the penalty

31

phase closing arguments. As a general matter, closing arguments in criminal cases "shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case." La.C.Cr.P. art. 774. Louisiana jurisprudence on prosecutorial misconduct allows prosecutors considerable latitude in choosing closing argument tactics. The trial judge has wide discretion in controlling the scope of closing argument. *State v. Prestridge*, 399 So.2d 564, 580 (La. 1981). Even if the prosecutor exceeds these bounds, a reviewing court will not reverse a conviction due to an improper remark during closing argument unless the court is ***thoroughly convinced*** the argument influenced the jury and contributed to the verdict, "as much credit should be accorded the good sense and fairmindedness of jurors who have seen the evidence and heard the arguments, and have been instructed repeatedly by the trial judge that arguments of counsel are not evidence." *State v. Martin*, 93-0285, p. 18 (La. 10/17/94), 645 So.2d 190, 200; *see State v. Jarman*, 445 So.2d 1184, 1188 (La. 1984); *State v. Dupre*, 408 So.2d 1229, 1234 (La. 1982).

In his nineteenth assignment of error, defendant argues that "[i]n penalty phase rebuttal arguments the State repeatedly commented that defense attorney Richard Goorley had a 'fanatically abusive' interpretation of the law, was 'obscene and insulting,' was 'threatening' jurors, and calling them 'killers' and 'not Christian.'" In particular, he points to portions of the State's rebuttal in which the prosecutor made personal remarks towards defense counsel:

> So let's take a deep breath and really analyze the law here, because unlike Mr. Goorley, I don't think of you as killers and I don't think of the law as vengeful . . . .
>
> So now that you have found this defendant guilty of [first-degree] murder under one of those circumstances, you are legally, legally, entitled to consider both punishments. It is only a fanatical abuse of that analysis that would lead Mr. Goorley to call you killers because you followed the law.

. . . .

And Mr. Goorley argues to you that if you don't have mercy for Mr. Reed, you're a killer, you're a vengeful killer. Because he used the word vengeance at least five times in his closing remarks in attributing to you that emotion if you had the temerity to simply follow the law.

Besides being obscene, those remarks are deeply insulting to you as citizens, tax paying, hard working citizens who did not choose to be here, who would rather be anywhere but here. But Mr. Goorley, dismissing that as a mere formality, suggests that you are killers and you have vengeance unless you have mercy for Mr. Reed.

. . . .

Because that's the argument when you strip the bark off the tree; well, if you don't have any mercy for him, there's nothing I can do for you, because you're lost, you're a vengeful killer. Man, what an argument.

And then the Bible. You know, what I don't understand is why we can't leave God out of this. I mean, the law does not talk about the Bible. The law does not talk about God. The law talks about aggravating circumstances and mitigating circumstances and it talks about the circumstances of the offense and it talks about the character and the propensity of the victim and the character and propensity of the defendant. But nowhere does it talk about the Bible. Nowhere does it talk about God.

But this is another insidious argument that Mr. Goorley would make; well, unless you believe in his interpretation of the Bible, you're no good. You're a vengeful killer. You're not worthy of consideration. And remember what the man said. And Mr. Goorley referred to Him as that man. I refer to Him as Jesus Christ, the son of the living God. But be that as it may. When you do to these the least of my brethren, you do to me. And he said that.

Does that mean that doesn't apply to the Adams brothers? When you slaughter them, didn't then you slaughter Him?

And it's so easy to get in to this and that's why the argument is so insidious, because Goorley says, This is my view of the Bible and unless you agree with my view of it, there's something wrong with you; you're not merciful; you're not Christian; you're not any good; you're a vengeful killer. Well, that's nonsense.

Because I also remember the same Christ saying, Whoa [sic] to you who would harm one of these, referring to children. It would be better that you had never been born. A millstone around your neck and dropped into the sea.

33

So does that mean my version of the New Testament is better or worse? No. I think the thing that we can do here best is to leave God out of it. He didn't make this happen and He's not responsible. . . .

Mr. Goorley appeals to your better nature, unlike Ms. Prudhomme and I who appeal to your baser nature. Geez. Well, where do I start with that? No, Ms. Prudhomme and I do not appeal to your baser nature and, no, Mr. Goorley doesn't really appeal to your higher nature, because what he's doing is threatening you. He's a little smooth about it –

. . . .

– but what he's doing is threatening you…

. . . .

And why – and how he's threatening you is he says unless you do what I tell you, unless you believe in my New Testament, unless you show mercy to Reed, then you're nothing but a killer. Now, you can call it anything you want, but I call it a threat. And he even said that would make you part of the killing. Now, if that's not a threat, I don't know what is.

He wants to make you tremble at the thought of doing your lawful duty. . . .

. . . .

You know, Christ said to Mary Magdalene, when they wanted to stone her to death for being an adulteress, Does no one condemn you? Then I don't condemn you. But the defense argument is I condemn you unless you do what I tell you to do.

The State – and this is a quote – the State calls for vengeance, death, death, death, heartless and no mercy. No. No. No. The State asks you to carefully consider the evidence, to carefully consider the character and propensities of the defendant and the victims and the victims' families, and to carefully consider the impact that the murder of these boys has had on the victims' families. That is not heartless. It is not merciless. It is not vengeful. It is the law. And if Mr. Goorley thinks that that law is heartless and vengeful and merciless, then he can go to the legislature and get it changed. That's how we do things in this society. We do not do that by threatening honest jurors.

At the conclusion of the State's rebuttal, defense counsel objected to the State's improper remarks and moved for a mistrial. The district court overruled the defendant's objection and denied his motion for mistrial, ruling:

I did find that your statements provoked some of the comments by Mr. Cox. Threatened is a strong word, but you told the jury – and my notes reflect – to elect the death penalty would make them part of the

killing, and we've had enough killing. Do you want to stoop to the level of being heartless and showing no mercy?

Defense counsel noted his objection for the record.[7]

While the State should refrain from making personal attacks on defense strategy and counsel, *State v. Brumfield*, 96-2667, p. 9 (La. 10/20/98), 737 So.2d 660, 666; *see also State v. Duplessis*, 457 So.2d 604, 608 (La. 1984) (prosecutor's comment that "a bus full of witnesses would not be enough for defense counsel because he was a 'very skillful lawyer'" improper), in this case, it appears the State was not commenting on counsel's character but rather responding to his argument, which suggested that to elect the death penalty would amount to an act of vengeance. Indeed, as evident from the State's comments, defense counsel invited the commentary on the Bible with the following statement, among others:

> But the State calls for vengeance, vengeance, vengeance; death, death, death. That's what they're saying. I'm calling on what we learned when we were growing up every Sunday; what you do to the least of my brethren, you do to me.

That being the case, it does not appear the State's argument exceeded the proper scope of rebuttal. *See* La.C.Cr.P. art. 774 ("The state's rebuttal shall be confined to answering the argument of the defendant."). Even assuming the prosecutor exceeded the bounds of proper rebuttal argument, the trial court clearly acted within its discretion when it denied the mistrial motion. *See* La.C.Cr.P. art. 775; *State v. Sanders*, 93-0001, p. 21 (La. 11/30/94), 648 So.2d 1272, 1288; *State v. Smith*, 430 So.2d 31, 44 (La. 1983) (Mistrial is a drastic remedy generally, and the determination "of whether prejudice has resulted lies in the sound discretion of the trial judge."). This assignment of error lacks merit.

Defendant broadly argues in his twentieth assignment of error that the State improperly commented on his presentation of mitigating evidence in the penalty

---

[7] Defendant re-urged this claim in his motion for new trial, which the trial court denied ruling that "Both sides responded to each other's comments, but I don't think any of the comments made justify a motion for new trial."

phase of his trial. Specifically, he points to statements prosecutors made in the closing and the rebuttal arguments of the penalty phase of his trial in which the State commented that defendant was "loathsome" and willing to sacrifice his family to preserve himself because he made the decision to allow his family to testify on his behalf in mitigation. Because defense counsel did not object to the prosecutor's allegedly improper comments concerning defendant's presentation of mitigating evidence, this aspect of defendant's claim was not preserved for review. La.C.Cr.P. art. 841; *Wessinger*, 98-1234, pp. 19-20, 736 So.2d at 180-81 (reviving contemporaneous objection rule for the penalty phase as well as guilt phase of a capital trial). Even absent the procedural bar, this claim is meritless as prosecutors did not argue "that a particular factor should not be a mitigating circumstance" but instead sought "to disprove the existence of a mitigating factor." *State v. Hampton*, 98-0331, p. 22 (La. 4/23/99), 750 So.2d 867, 886.

On a similar note, defendant contends the State improperly commented on defendant's failure to call Loshun Jackson's children to testify as mitigation witnesses and on defendant's emotionless state during the victim-impact testimony. Defense counsel objected to these improper remarks and requested a mistrial, which the trial court denied ruling "there's no grounds for a mistrial because of those comments." Defense counsel noted his objection for the record.

In reference to defendant's failure to show emotion, evidence that a capital defendant shows no remorse does not inject arbitrariness into the proceedings, as a lack of remorse is "relevant to the character and propensities of the defendant." *State v. Juniors*, 03-2425, p. 63 (La. 6/29/05), 915 So.2d 291, 336 (*citing State v. Wilson*, 467 So.2d 503, 523 (La. 1985) (*citing State v. Summit*, 454 So.2d 1100, 1108 (La. 1984) (*rev'd on other grounds*, *Summit v. Blackburn*, 795 F.2d 1237 (5th Cir. 1986)). As a comment directed to defendant's character and propensities, the statement was permissible. Second, as to the remarks concerning defendant's

failure to call Loshun Jackson's children as mitigation witnesses, the absence of witnesses constitutes permissible comments on the lack of evidence. *See* La.C.Cr.P. art. 774. Accordingly, given the broad latitude afforded to the prosecutor during closing arguments, it cannot be said these few comments sprinkled over a 20-page closing argument were so egregious as to warrant the drastic remedy of a mistrial. *Martin*, 93-0285, p. 18, 645 So.2d at 200. These claims have no merit.

In his twenty-first assignment of error, defendant complains that in guilt and penalty phase arguments, "the State repeatedly misstated testimony and created theories out of whole cloth in an effort to convince the jurors that Marcus Reed's actions were not justified," which influenced the jury. Specifically, defendant argues three instances the State misstated evidence, namely: (1) "Marcus Reed lured the victims to his house;" (2) "he did not claim self-defense to Clarence Powell;" and (3) "Mr. Reed poured gasoline on the victims in an attempted arson." Because defense counsel did not object to any of these comments during the State's opening and/or closing arguments at the guilt and the penalty phases, the defendant failed to preserve the issues for review. La.C.Cr.P. art. 841; *Wessinger*, 98-1234, pp. 19-20, 736 So.2d at 180-81. Even absent the procedural bar, given the staggering breadth of the evidence presented against defendant, we are not "firmly convinced that the jury was influenced by the remarks and that they contributed to the verdict." *State v. Taylor*, 93-2201, p. 19 (La. 2/28/96), 669 So.2d 364, 375. Thus, we detect no reversible error.

### Assignment of Error 22

Next, defendant asserts the State deprived defendant of due process of law when it "improperly threatened to arrest or criminally charge three trial witnesses," namely: (1) Brian Wafer; (2) Clarence Powell; and (3) Kyle King. As to Brian Wafer, who is defendant's first cousin, during its direct examination, the State

played a pertinent portion of Mr. Wafer's recorded interview and allowed Mr. Wafer to review the transcript of the statement as he could not recall how he described defendant's demeanor. Even then, Mr. Wafer testified he had no recollection of his statements. Prosecutor, Dale Cox, then addressed Mr. Wafer: "I want to read you something and then I'm going to ask you a couple of questions. Revised Statute 14:123, perjury—"Before the prosecutor could read any further, defense counsel objected. The court then excused both the jury *and* Brian Wafer. Outside of the presence of the jury, defense counsel requested a mistrial on the basis that the prosecutor began to read the perjury statute in front of the jury. After considering the defense's motion for mistrial, the trial court denied the motion for mistrial and instructed the State not to read the statute but only to "remind [Mr. Wafer] he's under oath":

> [Y]ou can remind him he's supposed to tell the truth; you can remind him if it's determined that he's not telling the truth what the consequences are and that he can be charged with a felony and the punishment is a sentence of hard labor.

Defense counsel noted his objection for the record. The State then went on to remind Brian that he was under oath and that the penalty for perjury is five to 40 years at hard labor.

We find the trial court did not err in denying the motion for mistrial. Defendant fails to show the perjury charges would have been unwarranted. Thus, he does not demonstrate an ***improper*** influence on the witness. *See generally State v. Muse*, 363 So.2d 462, 468-69 (La. 1978) (prosecutor may tell witness outside of the presence of jury that he will charge witness with perjury if testimony not in accord with previous statements); *State v. Selmon*, 343 So.2d 720, 721 (La. 1977) (prosecutor may remind witness of consequences of perjury); *State v. Spotville*, 308 So.2d 763, 766 (La. 1975) (finding no error where prosecutor read perjury statute to witness in presence of jury where the witness' testimony was not in

accord with previous statements). Accordingly, the trial court did not abuse its wide discretion when it denied defense's motion for a mistrial.

With respect to Clarence Powell, the record reflects that on the morning of September 30, 2013, Clarence, who was under subpoena and instructed to appear for 9:00 a.m., was not present in court. The State requested a bench warrant without bond. After a break was taken, Clarence arrived at court. Outside of the witness' presence, the State maintained its request for a bench warrant and for Clarence Powell's arrest. The court denied the motion. Under La.C.Cr.P. art. 21, failure to comply with a subpoena is a direct contempt of court. Thus, it does not appear the prosecutor's request for a bench warrant due to Clarence's failure to appear in court at the instructed time constituted an act of misconduct. Moreover, the record reflects that Clarence Powell was not present in the courtroom when the prosecutor requested the bench warrant. Thus, the prosecutor's statements could not have influenced the witness' subsequent testimony.

Lastly, defendant argues that, before Kyle King entered the courtroom to testify in defendant's guilt phase case-in-chief, the State threatened to arrest him based upon his upcoming testimony about his participation in the burglary of defendant's residence. The record reflects that out of the presence of the jury and of Kyle King, the State objected on the record:

> I think at the very least he needs to be advised of his *Miranda* rights before he gives testimony in this court, because I will give notice right now that if he admits to a crime, I'm going to indict him and he probably won't leave this building, because I will secure an arrest warrant for him.

In response, defense counsel argued:

> They've already questioned him. Apparently they gave him some sort of inclination [sic], testimony before in front of the Grand Jury, that they were not going to [pursue a charge]. Now the only time they're going to bring it up is when the defense intends to use it.

After reviewing Kyle's statement to the police and grand jury testimony, the trial court noted for the record that "[t]he State has had plenty of time to charge him because of his admission of a crime before—under oath before the Grand Jury. So I don't really see what difference it makes if he testifies again." The prosecutor withdrew his objection, commenting, "I don't think [Mr. King] needs any advisement of any kind. I agree with the Court. Let him come testify to whatever he will." The court ordered that Kyle be brought back into the courtroom and that he be advised of his rights outside the presence of the jury. Kyle testified that he understood he could be charged with burglary if he testified at trial and that he did not wish to assert his Fifth Amendment rights and request a lawyer.

As an initial matter, the trial court did not err in ordering Kyle King be advised of his right to invoke the Fifth Amendment privilege, as any testimony he gave concerning his participation in the burglary of defendant's residence would be self-incriminating.[8] Moreover, because the State withdrew its objection before the trial court ruled, it is unclear how these arguments outside of the presence of the jury and the witness prejudiced the defendant. Further, defendant was not deprived of his right to present a defense as Kyle King waived his Fifth Amendment privilege and willingly testified to his participation in the burglary of defendant's residence. Defendant fails to show the State's actions constituted prosecutorial misconduct.

This assignment of error is meritless.

### Assignment of Error 23

Finally, defendant complains that the State failed to correct the false or misleading testimony of two witnesses, Detective Keith Fox and Terry Matthews.

---

[8] Notably, a witness may invoke the Fifth Amendment privilege only when he has reasonable cause to apprehend danger of self-incrimination from a direct answer. *State v. Brown*, 514 So.2d 99, 109 (La. 1987).

As a general matter, if a prosecutor allows a State witness to give false testimony without correction, a reviewing court must reverse the conviction gained as a result of that perjured testimony, even though the testimony goes only to the credibility of the witness. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); *State v. Williams*, 338 So.2d 672, 677 (La. 1976). Even if the State does not solicit the false testimony, its failure to correct it "when it appears" violates due process guarantees. *Napue*, 360 U.S. at 269, 79 S.Ct. at 1177; *State v. Ellender*, 354 So.2d 500, 503 (La. 1978). When such false testimony goes before the jury, the defendant must receive a new trial unless there is no reasonable likelihood that the alleged false testimony could have affected the outcome of the trial. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *State ex rel. Shilling v. Whitley*, 92-3312 (La. 4/29/94), 637 So.2d 459.

First, defendant claims Detective Keith Fox gave untruthful testimony as to the existence of a fourth individual in the victims' vehicle. Defendant fails to point to any false testimony. Detective Fox testified on direct examination that when he arrived at the crime scene the night of August 16, 2010, his team had received information "that there may be a fourth victim." He testified the investigatory team continued to search for a possible fourth victim the following day, but he noted the search did not lead to the discovery of a fourth victim. On cross-examination, as defense counsel attempted to elicit information from Detective Fox that he had received information of the fourth person "in the car," Detective Fox clarified he "just had information that four people had been shot," and "it was never specified that the fourth victim was in the car." When defense counsel asked Detective Fox whether he spoke to Shannon Garland, the State made a hearsay objection, the trial court sustained the objection, and defense counsel ended his

examination before Detective Fox could have the opportunity to explain himself further.

As an initial matter, the record is devoid of any allegation the State acted in collusion with Detective Fox or that Detective Fox made contradictory statements. Moreover, because Shannon Garland was not interviewed until the following morning, during the early hours of the investigation, officers only had the initial statements made by Daniel Jackson who informed James Hendrix after fleeing the crime scene that four individuals had been shot. Thus, it does not appear Detective Fox had knowledge of whether the fourth potential victim had been observed *inside of the vehicle* at this point during the investigation. Furthermore, defense counsel thoroughly cross-examined both eyewitnesses, Daniel Jackson and Shannon Garland, concerning their prior statements made to police officers about the number of persons inside of the victims' vehicle. Thus, the jury was fully aware of the substance of Daniel's and Shannon's initial reports as they related to the presence of a potential fourth person in the vehicle. This claim is meritless.

Defendant also contends Terry Matthews testified on cross-examination that he *did not speak with anyone* about defendant's case and, in particular, that he did not speak to his wife about the matter nor did she inform him of any information she learned from news reports concerning defendant's case. In support of this argument that Terry Matthews testified falsely, defendant points to his recorded interview with Detective Keith Fox from 2011, in which Terry mentions telling his "wife" about defendant's admissions to him and explains his "wife" responded, "yeah, over an X-box or something, they were kids." Although it does appear Terry Matthews previously gave an inconsistent statement in reference to whether he spoke to his previous girlfriend, whom he referred to as his "wife," about defendant's case, defendant fails to show the prosecutor was aware Terry Matthews' testimony was false. *Cf. State v. Doleman*, 02-0957, p. 18 (La. App. 4

Cir. 12/4/02), 835 So.2d 850, 862 ("The mere fact that witnesses testified differently at different proceedings [separated by six years] does not prove that they testified falsely. At best, such conflicting testimony indicates that they may have recalled things differently [with the passage of time]. Furthermore, it cannot be presumed that [the] prosecutor has knowledge that a witness's answer is false simply because the witness may have testified somewhat differently at a prior proceeding."). In the instant case, Terry gave his statement to Detective Fox in 2011, and trial did not begin until September 28, 2013. Defendant had a copy of the recorded interview at trial and had an opportunity to cross-examine this witness to impeach his credibility. It was up to defense counsel to explore the discrepancies between Terry Matthews' recorded interview and his trial testimony. Nevertheless, given the overwhelming evidence of defendant's guilt based on eyewitness testimony and incriminating physical evidence and autopsy results, it does not appear the discrepancies in Mr. Matthews' testimony affected the outcome of the verdict. This claim fails.

*Hearsay*

### *Assignments of Error 1 through 4*

Defendant next claims the court improperly excluded testimony from a witness who was prepared to testify defendant warned the victims to stay away from his residence before the instant homicides occurred. Specifically, defendant's neighbor, Clarence Powell, overheard defendant arguing with an individual on the telephone, yelling

> I don't know what the hell y'all think y'all doing and I'm not the one to play with; don't—don't bring this stuff to my house, don't bring it down here; I don't mess around with nobody . . . . He said I don't mess with nobody, I stick to my fucking self . . . .

According to Clarence in his initial statement to police, he overheard defendant having this telephone conversation about 30 minutes before he *heard* a

43

confrontation between defendant and an unknown voice in defendant's yard.

At trial, the State objected to the introduction of this testimony as inadmissible hearsay, and the court sustained the objection, ruling that

> [Mr. Powell] wasn't present when the phone call was made; he was at his house 20 yards away. So – and it's not reliable, it's not trustworthy, and so its hearsay . . . Mr. Powell's account of it is not reliable and trustworthy so as to make it an exception to the hearsay rule, because he was not present. He didn't witness the declarant's demeanor. He didn't see it happen. So it's not reliable.

Defense counsel noted his objection for the record. According to defendant, the testimony was admissible as non-hearsay under the res gestae exclusion to the hearsay rule.

Hearsay is a statement, other than one made by the declarant while testifying at the present trial, offered in evidence to prove the truth of the matter asserted. La.C.E. art. 801(C). Hearsay is inadmissible unless it falls within an exception. La.C.E. art. 802. La.C.E. art. 801(D)(4) excludes from hearsay things said and done

> under the immediate pressure of the occurrence, through the instructive, impulsive and spontaneous words and acts of the participants, and not the words of the participants when narrating the events, and which are necessary incidents of the criminal act, or immediate concomitants of it, or form in conjunction with it one continuous transaction.

The res gestae hearsay exclusion in Louisiana is broad and includes not only spontaneous utterances and declarations made before or after the commission of the crime, but also testimony of witnesses and police officers pertaining to what they heard or observed during or after the commission of the crime if a continuous chain of events is evident under the circumstances. *See State v. Huizar*, 414 So.2d 741, 748 (La. 1982); *State v. Kimble*, 407 So.2d 693, 698 (La. 1981).

Under the res gestae exclusion, statements must be spontaneous words of the participants which are necessary incidents of the criminal act. Here, although Mr. Powell overheard defendant arguing with an unknown individual on the telephone

44

shortly before the homicides occurred, he did not personally observe defendant speaking on the telephone, or witness the crimes for that matter. Therefore, Mr. Powell could not ascertain defendant's emotional state to indicate whether he made the statements "under immediate pressure of the occurrence," La.C.E. art. 801(D)(4). Thus, under the circumstances, it is not evident that defendant's statements on the telephone acted as a prelude to the criminal acts, and the exclusion is not applicable.

Alternatively, defendant argues the court improperly excluded the testimony because the statement was not hearsay—that is, because it was not offered for the truth of the matter asserted but to show that the utterance occurred. In support, defendant points to this Court's instructive explanation in *State v. Everidge* concerning what kind of statements constitute hearsay:

> In order to fall within the definition of hearsay, the statement must be offered to prove the truth of the statement's contents. To illustrate this point, the victim stated, "Come over to my apartment tonight" or words to that effect. The statement was not offered to prove any assertion within the statement such as ownership of the apartment, but to establish the fact that the statement was made. We contrast this scenario to one where a witness states that declarant said, "John killed Jane." The matter asserted is that John killed Jane.

96-2665, p. 7 (La. 12/2/97), 702 So.2d 680, 685. The State disputes defendant's assertion that this statement is not hearsay. In support, the State cites the following language from the Second Circuit's opinion in *State v. Hicks*:

> [T]he mere assertion that the hearsay rule does not apply, if the statement is offered only for the fact that it was stated and not as proof of the fact in the statement, is not a correct statement of the law. Any testimony could be admitted under this reasoning by the fiction that the testimony is elicited "for the mere fact it was stated" rather than for its truth. There must be some purpose in admitting the testimony other than to show the truth of the matter.

607 So.2d 937, 946-47 (La. App. 2 Cir. 1992). Notably, the hearsay objection in *Hicks* arose when defense counsel, on cross-examination, asked a police officer whether the owner of a bar remembered the victims being present at her bar. 607

So.2d at 946. While the testimony defense attempted to elicit in *Hicks* was clearly offered for the truth of the matter asserted—that is, that the victims were or were not present at the bar on the evening in question—Clarence Powell's statement was not offered for the truth of the statement but was offered to show defendant's state of mind prior to the shooting. As we explained in *State v. Brown*,

> One of the traditional hearsay exceptions allows the introduction of extrajudicial declarations at trial to prove the state of mind of the declarant. *State v. Sheppard*, 371 So.2d 1135 (La.1979); *State v. Weedon*, 342 So.2d 642 (La.1977). Thus, whether the declaration is a direct assertion of the speaker's state of mind (hearsay) or whether the declaration tends to indirectly establish the declarant's state of mind (non-hearsay), Louisiana jurisprudence admits the declaration if the declarant's state of mind is at issue or is relevant to prove a fact at issue. *State v. Martin*, [458 So.2d 454, 461 (La. 1984)] (relevancy is a requirement for both the hearsay and non-hearsay extrajudicial declarations).

562 So.2d 868, 877-78 (La. 1990); *see State v. Raymond*, 245 So.2d 335, 340 (La. 1971) (the victim's extrajudicial declaration of fear of or revulsion by defendant made several hours before the homicide was admitted as relevant, non-hearsay circumstantial evidence concerning the victim's state of mind about defendant). Because we find defendant's statement tended to indirectly establish defendant's state of mind which was at issue in this case, the statement was a non-hearsay statement which should not have been excluded.

Nevertheless, we find this error was harmless. Although the court excluded this testimony which, defendant asserts, could have supported his theory of self-defense at trial, the court permitted Mr. Powell to testify—over the State's objection—to overhearing a confrontation with strikingly similar content between defendant and an unknown voice immediately prior to the shooting. Thus, it does not appear the court's exclusion of this portion of Mr. Powell's testimony compromised defendant's right to present a defense. We are convinced that, given the overwhelming evidence of defendant's guilt, the jury's verdict in this case was

surely unattributable to this error. La.C.Cr.P. art. 921; *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993); *Sanders*, 93-0001, p. 17, 648 So.2d at 1286.

Accordingly, these assignments of error fail.

### *Assignment of Error 27*

Defendant also argues the trial court improperly excluded as hearsay testimony from Kyle King that the victim, Jarquis Adams, informed him of specific items to steal from defendant's residence. Specifically, the defense elicited testimony that, after driving to defendant's residence, Kyle remained in the vehicle while Jarquis went inside the home. Defense counsel elicited further testimony that Jarquis returned to Kyle's vehicle after inspecting the Jackson residence, ***that he said something to Kyle***, and that they then together proceeded to burglarize the home. The jury heard all of this testimony. Defendant, however, contends the trial court erred because it refused to allow Kyle to testify about ***what precisely Jarquis said*** immediately prior to the burglary—that is, that Jarquis indicated to Kyle, "There's two amps and an Xbox in there, do you want to get them?" The State objected to the introduction of this testimony as inadmissible hearsay, and the court ruled that the statement was hearsay and further explained that Mr. King could only "testify about things that happened, what he observed, not what was said during the burglary." The defense noted its objection for the record.

Defendant contends the statements were res gestae. However, as discussed above, under the res gestae exclusion, statements must be spontaneous words of the participants which are necessary incidents of the criminal act. As an initial matter, although the burglary of his residence arguably speaks to defendant's motive in the instant homicides, the burglary occurred almost 10 hours before the homicides. As such, it does not qualify as a statement which is "the necessary

incident[]of the criminal act, or immediate concomitant[] of it, or [which] form[s] in conjunction with it one continuous transaction." La.C.E. 801(D)(4). Moreover, this statement does not constitute "impulsive or spontaneous" words made "under the immediate pressure of the occurrence." La.C.E. art. 801(D)(4). Instead, the statement—an explanation of what Jarquis saw inside defendant's home—was primarily narrative in nature. *See State v. Jacobs*, 281 So.2d 713, 715 (La. 1973) (declaration by the victim not considered res gestae when it is narrative rather than spontaneous); *cf. State v. Hunter*, 343 So.2d 143, 144 (La. 1977) (victim's spontaneous statement immediately after the crime, in the excitement of the occurrence, is generally considered res gestae). As such, the trial court properly found the res gestae exclusion inapplicable. Additionally, given that Kyle King provided ample testimony at trial as to Jarquis' involvement in the burglary of defendant's residence and his intent to return to defendant's residence to steal additional items, it is difficult to discern any prejudice from the trial court's exclusion of this statement. This claim fails.

### *Assignments of Error 5 through 7*

Next, defendant claims the trial court erred in excluding portions of Robert Washington's testimony which was offered to impeach Terry Matthews' testimony concerning a series of incriminating statements defendant made to Mr. Matthews and in Mr. Matthews' presence while incarcerated at Caddo Correctional Center. As defense counsel attempted to elicit information from Mr. Washington about the content of the conversations he had with Mr. Matthews and defendant as they walked to the van, the State objected to the entire line of questioning as improper extrinsic impeachment evidence and as to relevancy. The court held a bench conference and, subsequently on the record, informed Mr. Washington, "[Y]ou can't say what anybody else said to you. That would be hearsay and it's not admissible." Defendant argues that Mr. Washington's testimony did not constitute

48

hearsay as it was to be introduced to impeach the testimony of Terry Matthews through contradiction under La.C.E. 607(D)(2) and that the court's error in excluding the testimony denied defendant his right to present a defense.

Because defense counsel did not object to the trial court's ruling excluding Mr. Washington's testimony, these claims were not preserved for review. La.C.Cr.P. art. 841; *Wessinger*, 98-1234, pp. 19-20, 736 So.2d at 180-81 (appellate review in capital cases is limited to alleged errors for which the complaining party lodged a contemporaneous objection). Even absent the procedural bar, however, defendant shows no reversible error. Because the testimony of Terry Matthews was corroborative of the eyewitness testimony of Daniel Jackson and Shannon Garland and given the overwhelming testimonial and physical evidence presented by the State to prove defendant's guilt, defendant fails to show the exclusion of this evidence had a substantial and injurious effect on the jury's verdict. La.C.Cr.P. art. 921; *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828; *Sullivan*, 508 U.S. at 279, 113 S.Ct. at 2081; *Sanders*, 93-0001, p. 17, 648 So.2d at 1286.

Accordingly, these assignments of error fail.

***Inadmissible Other Crimes Evidence Admitted in the Guilt Phase***

***Assignments of Error 28 through 31***

In his next argument, defendant claims that the State presented inadmissible other crimes evidence alleging that defendant was a well-known marijuana dealer in the neighborhood. On January 23, 2013, the court conducted a hearing on the admissibility of evidence concerning defendant's drug activity. The State argued the drug activity was relevant to show intent, knowledge, absence of mistake, plan, and motive and claimed the purpose of the introduction of the evidence was not "just to show that Mr. Reed supposedly is a drug dealer or does drugs or has people in or around his home consuming drugs" but rather to show that victim Jarquis Adams knew defendant and previously participated in drug transactions with

49

defendant at his residence. Further, the State maintained the drug activity was relevant to this case because defendant was a known drug dealer and because Jarquis allegedly stole drugs from defendant's home the day the homicides occurred.

On January 29, 2013, the court ultimately granted the State's request and found the State offered sufficient evidence to prove that the homicides were committed in connection with drug activity. In particular, the court found:

> In connection with the drugs there was some testimony, of course, they, of the incident, the testimony about a quarter pound of weed coming up missing, I'm reading from the transcript, and that Mr. Reed, of course, felt that his home had been burglarized and possibly the weed had been taken from his home as well as other items to include an amp, Xbox and other items.
>
> As far as motive, I think was argued by Ms. Prudhomme, that motive was one of the items that was present in connection with the evidence of drugs is that he felt the drugs were taken from his home, and even there was some testimony about another individual who took him to get some drugs and other individuals sitting at his house on the date in question waiting to purchase drugs from Mr. Reed. I do believe that the State has satisfied its burden in connection with the drugs and that the drugs and the evidence of that activity or those acts can be admitted.

Defense counsel then asked the court to clarify its ruling with respect to the admission of this evidence of drug activity:

> MR. GOORLEY: Your Honor, I have a question, if I may about the evidence as to the drugs. I understand the part of the ruling about anything may [sic] allege to be taken at that time which would have been the marijuana that was alleged to have been taken. I think what the State is attempting to introduce is evidence that there was drug activity going on there. Is the Court ruling that evidence is admissible? That's what they were trying to get in.
>
> THE COURT: It's my understanding they were trying to get in drug activity insofar as testimony about one of the individuals, whose name escapes me now, took Mr. Reed to pick up drugs while other individuals were even at his house, two individuals were at his house saying they were waiting to purchase drugs.
>
> MS. PRUDHOMME: That's correct, Your Honor, that witness's name would be [Glen Merrell].
>
> THE COURT: That's the individual who actually took him, I believe.

MS. PRUDHOMME: Shannon and Bridgett[e] Garland were waiting.

THE COURT: Shannon and Bridgett[e] Garland were waiting to purchase drugs. Evidence of—and then, of course, testimony about quarter pound of drugs, weed, coming up missing—hold on. Let me finish so you understand then you might have a further question. Quarter pound of weed missing, I'm saying all of this activity goes to motive.

MR. GOORLEY: All the evidence about drug activity is admissible, is that what you're ruling?

THE COURT: Yes.

The defense counsel noted his objection for the record and gave notice of his intent to seek supervisory review. On April 11, 2013, the court of appeal denied writs on the showing made. *State v. Reed*, 48,342 (La. App. 2 Cir. 4/11/13) (unpub'd).[9]

Generally, courts may not admit evidence of other crimes or bad acts to show the defendant is a man of bad character who acted in conformity with his bad character. La.C.E. art. 404(B)(1). However, the State may introduce evidence of other crimes or bad acts if it has established an independent relevant reason—i.e., to show the defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or accident—or if the evidence relates to conduct constituting an integral part of the act or transaction that is the subject of the present proceeding. *State v. Prieur*, 277 So.2d 126, 130 (La. 1973). Currently, *Prieur* does not require a pre-trial evidentiary hearing on the question of the admissibility of other crimes evidence; it requires only that, before such evidence is introduced, the State makes the requisite showing outside of the presence of the jury. *State v. Lukefahr*, 363 So.2d 661, 665 (La. 1978). La.C.E. arts. 401 and 402 establish the broad principle that relevant evidence—evidence having any tendency

---

[9] Defendant subsequently raised the issue in his motion for new trial, in which Judge Dorroh found that the "404(B) ruling by Judge Lafitte was not erroneous," nor was the ruling "restricted in any way."

to make the existence of any fact that is of consequence to the determination of the outcome more or less probable—is admissible unless provided otherwise. La.C.E. art. 403 allows the trial judge to exclude relevant evidence if, among other things, "its probative value is substantially outweighed by the danger of unfair prejudice…." Article 403, thus, operates in the context of character and propensity evidence. Although such evidence is quite likely to be relevant, its use is carefully limited because of a substantial danger of unfair prejudice. *See State v. Kahey*, 436 So.2d 475, 487 (La. 1983) ("Generally, evidence of other acts of misconduct is not admissible. The introduction of such evidence merely to prove that the defendant is a 'bad man' involves constitutional problems because of the danger that a defendant may be tried for a charge of which he has no notice, for which he is unprepared, and which unfairly prejudices him in the eyes of the jury.").

A trial court's ruling on the admissibility of the additional other crimes evidence will not be disturbed absent an abuse of discretion. *See State v. Henderson*, 12-2422, pp. 3-4 (La.1/4/13), 107 So.3d 566, 568; *State v. Gordon*, 13-0495, p. 23 (La. App. 4 Cir. 7/16/14), 146 So.3d 758, 772.

First, defendant argues the trial court erred when it ruled the evidence admissible because the alleged drug activity was not relevant to motive. Specifically, defendant claims the State failed to present evidence the homicides were a result of a "drug deal gone bad" and, instead, elicited testimony from "nearly every single lay witness" about his or her history of drug transactions with defendant, e.g., how long each had been purchasing marijuana from the defendant, how regularly each purchased from him, whether the sales were defendant's only source of income, and whether he had a "regular job." Contrary to defendant's assertions, evidence of drug activity that occurred at defendant's residence was admissible to show defendant's motive in the instant homicides. Here, evidence that defendant was a known drug dealer in the neighborhood, whose marijuana

supply had been stolen from his residence *on the day of the homicides*, clearly established his motive to identify the alleged burglar, Jarquis Adams, who previously purchased marijuana from him, and to kill him that same day.

Next, defendant claims, "Mr. Reed's past drug activity impacted the applicability of La. Rev. Stat. 14:20 to this case." In particular, defendant argues the State failed to present evidence that defendant "was engaged in unlawful conduct" when the shooting occurred. Accordingly, defendant maintains the State failed to disprove the defense's theory of justifiable homicide. However, with respect to *Prieur*, the State was not required to disprove the defendant's theory of self-defense but was required to prove defendant was a known marijuana dealer in the neighborhood. Based on Bridgette Garland's testimony concerning the telephone call she heard directing the person on the other end to come pick up a "package" which Bridgette understood to mean "marijuana," the State argued that the promise of marijuana is what brought Jarquis back to the Jackson residence. Thus, it was an issue of fact as to whether or not defendant was engaged in drug activity, or at least the pretense of drug activity, at the time of the homicides. Even assuming defendant was not engaged in drug activity at the time the homicides occurred, evidence establishing defendant's acquaintance with the victim because of his drug sales in the community was admissible to prove motive, opportunity, intent, knowledge, and absence of mistake.

Finally, defendant argues the probative value of this evidence was substantially outweighed by the risk of unfair prejudice to the defendant, in violation of La.C.E. art. 403. He explains jurors "were inundated with testimony about how often Mr. Reed sold marijuana, how much, and to whom," and argues the State "capitalized upon the prejudicial qualities of this evidence in closing statements, referring to Mr. Reed as a 'drug dealer' who 'makes his living selling marijuana.'" In the instant case, it is apparent the evidence of Jarquis' acquaintance

53

with defendant, due to previous drug transactions that occurred at defendant's residence, was offered to establish defendant had the intent and motive to commit the instant homicides. It was not offered to show defendant had a bad character. Specifically, the State presented evidence at trial that defendant's residence was burglarized the same day the homicides occurred, and marijuana was stolen. Further testimony revealed defendant was successful in identifying the burglar and, according to Bridgette Garland, subsequently expressed his intent to kill that person upon arrival at his residence. Notably, the defense presented the testimony of Kyle King at trial who admitted to burglarizing defendant's home along with victim Jarquis Adams on the day the homicides occurred. Based upon these circumstances, it does not appear the trial court abused its discretion in admitting the other crimes evidence. Therefore, evidence of regular drug activity that occurred at defendant's residence was properly admissible to show intent, motive, opportunity, and absence of mistake, and the introduction of this evidence was not outweighed by any prejudicial effect. *See Prieur*, 277 So.2d at 128. Given the veritable mountain of evidence the State presented to prove defendant was guilty of the first-degree murders of Jeremiah, Jarquis, and Gene, we have no concerns the jury judged him guilty "on a ground different from proof specific to the offense charged." *See Old Chief v. United States*, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997).

These assignments of error fail.

### *Inadmissible Other Crimes Evidence Admitted in the Penalty Phase*

### *Assignments of Error 32 through 35*

Defendant maintains that the trial court erred in allowing evidence of defendant's prior conviction through the testimony of an arresting officer and evidence of defendant's unadjudicated and non-violent attempt to bring contraband into the Caddo Parish Correctional Center.

On May 17, 2011, the State filed a "Notice of Intent to Use Other Crimes Evidence at Sentencing Hearing," in which it sought to introduce evidence of defendant's 2007 prior felony conviction for illegal use of a weapon. At a hearing held on June 13, 2012, the trial court heard Detective Rod Demery's testimony concerning the investigation of the crime, defendant's subsequent confession, and police officer Owen McDonnell's testimony as to fingerprint identification. In its ruling, the trial court found the "evidence meets all the criteria of the Supreme Court *Jackson* case in all respects. Accordingly, this evidence is admissible at the sentencing hearing of the district attorney's case in chief." The defense counsel noted his objection for the record.

On September 4, 2013, the State filed a "Supplemental Notice of Intent to Use Other Crimes Evidence at Sentencing Hearing," in which it sought to introduce evidence defendant made phone calls to family members while housed at the Caddo Correctional Center in an effort to introduce contraband into the jail. Before the penalty phase of trial, the trial court ruled that

> the tapes and the testimony of Detective Richardson are admissible and are relevant to the defendant's character, but they will be admitted with the following limitations: The State—or qualifications, whatever you want to call them:
>
> The State may use the jail calls to establish Mr. Reed used another inmate's SO number to place the calls to his family members. They can establish that one of the purposes of the calls was to—was for Mr. Reed to attempt to get friends and/or family members to bring unknown contraband into the jail, which is against the jail rules.
>
> Detective Richardson, subject to cross-examination, can voice his opinion based upon his years of experience in the field of police work as to what the contraband he believes Marcus Reed was attempting to get into the jail. And I want it made clear to the jury that Mr. Reed was not actually caught with contraband, but it was his attempt to do so that goes to his character.

La.C.Cr.P. art. 905.2 provides, "The sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and

55

the victim, and the impact that the crime has had on the victim, family members, friends, and associates." It is well-settled the State is entitled to introduce evidence of a capital defendant's unrelated convictions at the penalty phase as reflective of his character and propensities. *State v. Jackson*, 608 So.2d 949, 954 (La. 1992). A large amount of highly relevant evidence usually will not result in the injection of an arbitrary factor into the capital sentencing hearing, although arguably there may reach a point where the sheer magnitude and details of the evidence, while highly probative, impermissibly shifts the jury's focus from its primary function of determining the appropriate sentence for this offense and this offender. *State v. Comeaux*, 93-2729, p. 11 (La. 7/1/97), 699 So.2d 16, 22-23. *Jackson* specifically limited "the evidence supporting the conviction to the document certifying the fact of conviction and to the testimony of the victim or of any eyewitness to the crime." *Jackson*, 608 So.2d at 954. "This limitation . . . prohibit[s] witness testimony relevant to the original offense of which the defendant was charged in an unrelated matter and to which the defendant pleaded guilty to a lesser offense." *State v. Langley*, 94-0999, p. 1 (La. 4/21/94) 639 So.2d 211, 212.

As to the admission in penalty phase hearings of unrelated and unadjudicated crimes evidence to prove the defendant's character and propensities, in *State v. Brooks*, 541 So.2d 801 (La. 1989), this Court approved the State's introduction in its case-in-chief in the penalty phase of two unrelated and unadjudicated murders once the trial judge determined that: (1) the evidence of the defendant's commission of the unrelated criminal conduct is clear and convincing; (2) the proffered evidence is otherwise competent and reliable; and (3) the unrelated conduct has relevance and substantial probative value as to the defendant's character and propensities. *Brooks*, 541 So.2d at 814. In *State v. Jackson*, the Court granted pre-trial writs to establish limitations on admissibility of unrelated and unadjudicated criminal conduct in capital sentencing hearings.

*Jackson* incorporated the three-pronged test from *Brooks*. *Jackson*, 608 So.2d at 955. *Jackson* also added the additional limitation that the evidence of the unadjudicated criminal conduct must involve ***violence against the person of the victim*** for which the period of limitation for instituting prosecution had not run at the time of the indictment of the accused for capital murder. *Id.* In *State v. Comeaux*, 93-2729, p. 10, 699 So.2d at 22, this Court revisited the issue and noted the thrust of *Jackson* was not to exclude any evidence that was significantly relevant to the defendant's character and propensities, no matter what the amount of the evidence was, but rather to maintain the jury's focus on their function of deciding the appropriate penalty by eliminating marginally relevant evidence that does not aid the jury in performing this function. This Court then set out to provide guidelines to help determine whether character and propensity evidence is admissible at the penalty phase. This Court held,

> Evidence that establishes the defendant in the recent past has engaged in criminal conduct ***involving violence to the person is highly probative of the defendant's character and propensities***. Such evidence generally would not inject an arbitrary factor into a capital sentencing hearing, especially when the conduct involves the same or similar crime committed in a similar manner. On the other hand, the type of evidence that tends to inject arbitrary factors into a capital sentencing hearing usually is evidence which is of only marginal relevance to the jury's determination of the character and propensities of the defendant.

*Comeaux*, 93-2729, p. 11, 699 So.2d at 22 (emphasis added).

Defense counsel did not object to the State's use of Detective Demery, who was neither a victim nor an eyewitness of this crime, to establish the fact of defendant's prior conviction and the facts surrounding it. Accordingly, defendant did not preserve these issues for appeal. La.C.Cr.P. art. 841; *Wessinger*, 98-1234, pp. 19-20, 736 So.2d at 180-81. Even absent the procedural bar, defendant's claim fails. We note defendant alleges a violation of a jurisprudential rule, not a statutory rule. Despite the technical violation of *Jackson*, after reviewing the record, it does

not appear the testimony and evidence presented by Detective Demery injected an arbitrary factor into the jury deliberations. Detective Demery's testimony concerning defendant's prior conviction was presented in a concise and efficient manner, with his entire testimony consuming only 13 pages of the penalty phase transcript. The jury was properly aware of defendant's past conviction because such evidence is relevant to his character and propensities. The jury was presented with overwhelming evidence in this case that showed defendant shot three unarmed victims, including a 13-year-old boy, multiple times with a semi-automatic rifle. Although it was arguably error for Detective Demery to testify to defendant's prior conviction for illegal use of a weapon, we find no prejudice is apparent in the method employed by the State to convey the appropriate information of defendant's criminal record to the jury, and Detective Demery's testimony does not undermine the confidence in the death penalty verdict. These claims fail.

As to the introduction of evidence concerning the unadjudicated conspiracy to bring unknown contraband into a penal institution, the State presented the testimony of Detective Terry Richardson, who testified concerning his investigation into defendant's participation in a scheme to bring contraband into Caddo Correctional Center. Although defense counsel urged several arguments for the exclusion of evidence concerning this unadjudicated act, defense counsel never argued *Jackson* required its exclusion because this conduct involved a ***nonviolent*** unadjudicated act and never urged this point as a basis for his objection. 608 So.2d at 955. It is well settled that a new basis for an objection may not be urged for the first time on appeal. La.C.Cr.P. art. 841(A) ("It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and ***the grounds therefor***.") (emphasis added); *State v. Butler*, 12-2359, p. 5

58

(La. 5/17/13), 117 So.3d 87, 89; *State v. Stoltz*, 358 So.2d 1249, 1250 (La. 1978). Because defense counsel never asserted this ground as the basis of his objection, defendant did not preserve this issue for review. Absent this procedural bar, however, we find this claim is meritless. Even assuming error *ad arguendo*, considering Det. Richardson's testimony only spanned 22 pages of the over 160 total pages of penalty phase transcript, given the appropriateness of the State's introduction of defendant's prior conviction for illegal use of a weapon as bearing on the character and propensities of defendant and, most importantly, given the overwhelming evidence that defendant brutally killed three unarmed young men, defendant fails to show here that introduction of this conspiracy evidence injected an arbitrary factor into the proceedings such that it impermissibly shifted the jury's focus from its primary function of determining the appropriate sentence for this offense and this offender. *Comeaux*, 93-2729, p. 11, 699 So.2d at 22-23. This claim is meritless.

In sum, after a thorough review of the record, we do not find the trial court's admission of Detective Demery's testimony concerning defendant's prior conviction for illegal use of a weapon and of Detective Richardson's testimony concerning the contraband conspiracy injected an arbitrary factor in the jury's sentencing decision. In light of the overwhelming and devastating evidence of defendant's crimes and of the aggravating factor—that defendant killed each of the three victims when he had the specific intent to kill or to inflict great bodily harm upon more than one person—supporting the jury finding that defendant committed three counts of first-degree murder, defendant has not demonstrated reversible error here. Thus, Assignment of Error 35 is meritless, as well.

### *Trial Judge's Emotional Display during Penalty Phase Testimony*

### *Assignment of Error 18*

Defendant argues the trial court erroneously denied a mistrial after the trial judge began openly crying during the victim impact testimony of Clara Morgan, the great aunt of the victims. Defendant claims the "court's actions constituted a non-verbal comment on the evidence, rendering Mr. Reed's death sentence unreliable."

During the penalty phase of the trial, the State presented the victim impact testimony of the victims' great aunt, Clara Morgan. At the conclusion of her testimony, the defense noted the trial judge's emotional reaction for the record, and the trial transcript reads in pertinent part:

> MR. GOORLEY: Your Honor, I realize Ms. Clara Morgan's testimony was heartfelt. I don't think that anybody in the courtroom wasn't affected by her testimony, and all our hearts went out to her and that caused emotion from everyone here, including me, including Mr. Reed, including Mr. Florence.
>
> But I have to protect the record, Your Honor—
>
> THE COURT: I understand.
>
> MR. GOORLEY: —and, therefore, I have to, for the record, state that right before we broke, that Your Honor was visibly impacted by that testimony and that you were—you were in tears, as Ms. Prudhomme was, and possibly other people were.
>
> But as the fact finder in this case—not the fact finder in the case, but the judge in this case, it is your duty to, let's say, not comment on the evidence.
>
> And for the record we would just state that the Court's emotional situation and tears was in fact a comment on her testimony. We want to make that part of the record clear for whatever purposes may come down the road.
>
> MR. COX: Well, is there a motion before the Court?
>
> Mr. GOORLEY: Yes, Your Honor. I would ask for a mistrial.
>
> MR. COX: We respectfully oppose the mistrial. We'll stipulate that Your Honor is human and we'll stipulate that any emotion that you may have shown in this matter was not a comment on the evidence.

What the code refers to by a comment on the evidence is if the judge were to say or infer to the jury the credibility of a witness or truthfulness or untruthfulness of a witness. To even suggest that honest human emotion is a comment on the evidence just—it shows how jaded the defense is and how jaded they've become that, you know—anyway, I object.

MR. GOORLEY: Your Honor, may I just comment on one thing?

THE COURT: I don't want to hear any more about it. Frankly I'm sick of the two of you, all of you, taking jabs at each other. And to quote Harmon Drew who said this in a trial that I had before him several years ago when he was still a district court judge, This is a heck of a way to make a living. It is.

And that was very difficult. But my emotions weren't different than many other people in the courtroom or the jury. I don't believe my emotions really had any impact on the jury. I kept my head down. I was visibly moved by it, as I'm sure I'm going to be visibly moved by Mr. Reed's family if they testify.

This is hard and it's—I'm an emotional person. I am. My emotions show on my face with what I do. They do. And that was very difficult, and I'll say it on the record. But I don't believe that it really impacts the jury to see any human being moved by that. It's not a comment on the evidence; it's not a comment on someone's testimony; it's not.

So I think everybody shows their emotions in different ways, and I believe every judge that has to sit through this feels the same way when these impact witnesses take the stand.

So I am going to deny your request for a mistrial at this time, and I'll note your objection for the record.

Significantly, prior to penalty phase closing arguments, the trial judge asked both the State and the defense "if either side believes an additional instruction is necessary concerning the emotions that took place yesterday." Both parties declined her offer to provide the jury with an additional instruction.

The defense raised this issue again in its omnibus motion for new trial. The trial court denied relief on the issue, noting "although the Court was emotional during the victim impact testimony presented by the State[,] the Court, defense counsel and the defendant were also very emotional when the defendant's victim testimony was presented."

As a general matter, mistrial is a drastic remedy which should only be declared upon a clear showing of prejudice by the defendant. La.C.Cr.P. art. 775; *Smith*, 430 So.2d at 44; *State v. Wilkerson*, 403 So.2d 652, 659 (La. 1982) (mere possibility of prejudice is not enough to warrant mistrial). In addition, a trial judge has broad discretion in determining whether conduct is so prejudicial as to deprive an accused of a fair trial. *Sanders*, 93-0001, pp. 20-21, 648 So.2d at 1288-89; *State v. Wingo*, 457 So.2d 1159, 1166 (La. 1984).

La.C.Cr.P. art. 772 prohibits comments on the evidence by the judge whether "recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted." *See State v. Williams*, 375 So.2d 1379, 1381 (La. 1979) (reversible error if judge makes any comment expressing or implying his or her opinion with regard to a material issue); *State v. Hodgeson*, 305 So.2d 421, 430 (La. 1974) (purpose of Art. 772 "is to insure that the jury is in fact the judge of the law and the facts on the question of guilt or innocence . . . ."). The prohibition extends to indirect, non-verbal conduct. *State v. Wright*, 445 So.2d 1198, 1200 (La. 1984). Although La.C.Cr.P. art. 772 precludes the judge from commenting in the presence of the jury upon the facts of the case, to constitute reversible error, improper comments must have influenced the jury and contributed to the verdict. *State v. Johnson*, 438 So.2d 1091, 1102 (La. 1983); *State v. Gallow*, 338 So.2d 920, 922 (La. 1976). Moreover, a trial judge's remarks constitute harmless error if those remarks do not imply an opinion as to the defendant's guilt or innocence. *State v. Joseph*, 437 So.2d 280, 282 (La. 1983). Further, courts have traditionally upheld denials of motions for mistral based on emotional outbursts when a defendant fails to show their influence upon the jury prejudiced his right to a fair trial. *State v. Clark*, 02-1463, p. 32 n.25 (La. 6/27/03), 851 So.2d 1055, 1079.

Here, the record reveals that, out of the presence of the jury, the trial judge

admitted she was "visibly moved" by the testimony. However, she acknowledged she kept her head down and her emotions "weren't different than many other people in the courtroom or the jury." It appears the trial court did not abuse its discretion when it found the emotional display did not impact the jury and did not constitute a comment on the evidence. Notably, at the conclusion of the family testimony presented by the defense in the penalty phase, out of the presence of the jury, the trial judge stated for the record that "both Mr. Florence and Mr. Goorley were emotional during that and their human feelings showed just like mine."[10] The record reflects the judge, the prosecutors, the defense counsel, the jury, and the witnesses all exhibited emotional responses during the testimony of both the victims' and the defendant's family members. The record clearly demonstrates that this case was a tragic and violent experience for the family members both of the victims and of the defendant. Nevertheless, "we must credit the jurors with the good sense and fair-mindedness to see these outbursts for what they were, the natural and irrelevant expression of human emotion, and not let the outbursts influence their decision on defendant's penalty." *Wessinger*, 98-123, p. 24, 736 So.2d at 183. A review of the record does not reveal the trial judge's emotional response exhibited in the courtroom implied an opinion as to the penalty that should be imposed or had any actual influence on the jury. Defendant fails to show abuse of discretion which would warrant the substitution of this Court's judgment for that of the trial judge who conducted the trial and who was in the best position to assess impact upon the jury. This claim is meritless.

## CAPITAL SENTENCE REVIEW

In the discharge of the duty imposed by the legislature to "review every sentence of death to determine if it is excessive," La.C.Cr.P. art. 905.9, this Court will review the record in a capital case to determine: (1) whether the sentence was

_____

[10] The attorneys did not respond to or dispute the judge's statement.

imposed under the influence of passion, prejudice or any other arbitrary factors; (2) whether the evidence supports the jury's finding of a statutory aggravating circumstance; and (3) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. La.S.Ct. Rule 28, §1. In the present case, Rule 28 review demonstrates defendant's death sentence is not excessive.

The Uniform Capital Sentence Report reveals defendant is a black male born on April 4, 1977. He was 33 years of age at the time of the offense and is now 39 years of age. He is divorced and has two children, who were 15 years of age and 10 years of age in 2014 when the Uniform Capital Sentence Report was completed. In terms of education, defendant has completed the 11th grade. His employment history includes Libbey Glass, Albertson's, and Building Supply. He also previously worked for the Shreveport Housing Authority, where he was an inspector. His most recent employment was in 2008 at Wal-Mart in the produce department. Immediately prior to incarceration, he applied for disability because of an injury to his arm he allegedly received as a child. Specifically, he reported he was unable to straighten one of his arms and the condition limited his employment options. He was previously convicted of misdemeanor simple battery in 1997, misdemeanor illegal carrying of weapons in 2002, and misdemeanor loud music in 2002, and he pled guilty to illegal use of weapons in 2007.

### *Passion, Prejudice, or Other Arbitrary Factors*

As discussed below, the record reveals no indicia of passion, prejudice, or arbitrariness.

First, defendant argues that race plays a "deleterious role in the administration of capital punishment in Caddo Parish" and in the determination of whether any given homicide was committed in self-defense. However, it appears defendant did not present this claim to the District Court where the necessary

64

factual development could occur. The claim rests on speculation, unsupported allegations, and the fact that during the five year period in which defendant was prosecuted, Caddo Parish was responsible for 40 percent of death sentences in the state. Notably, in the instant case, defendant and the victims were African Americans as were four members of the jury.

Second, defendant argues the prosecutor's impermissible references to religion in penalty phase closing arguments introduced passion and prejudice in the present case. As an initial matter, it does not appear defendant presented this claim in the District Court by contemporaneous objection. La.C.Cr.P. art. 841; *Wessinger*, 98-1234, pp. 19-20, 736 So.2d at 180-81 (reviving the contemporaneous objection rule for the penalty phase as well as guilt phase of a capital trial). Nevertheless, as discussed above, we find this claim to be meritless. Pursuant to La. C.Cr.P. art. 774, arguments by counsel may not appeal to prejudice and must be limited to the evidence admitted, the lack of evidence, conclusions of fact drawn from the evidence by the state or defense, and the applicable law. Art. 774 is applicable to capital sentencing procedure by virtue of La.C.Cr.P. art. 905.2 which adopts, insofar as they are applicable, the general provisions of the Code of Criminal Procedure as the procedure to be followed during the sentencing phase of the bifurcated trial. However, while this court may look to Art. 774 to determine if argument was improper, in reviewing whether it is *reversible error*, it must determine whether the argument introduced passion, prejudice or any other arbitrary factor into the proceedings which contributed to the jury's recommendation of the death penalty. *State v. Lindsey*, 404 So.2d 466, 483 (La. 1981). Furthermore, although courts have denounced references to religion, most have not held that such references warrant a reversal of the sentence. *See e.g.*, *United States v. Cartagena-Carrasquillo*, 70 F.3d 706, 713 (1st Cir. 1995) ("[A] reference to religion does not necessarily require reversal.").

As detailed more fully in our discussion of Assignments of Error 19 through 21, a review of the record reveals the prosecutor only referenced religion on rebuttal in response to defense counsel's references to the New Testament in his closing argument. In addition, the references in the instant case did not recommend that the jury rely on "religion" in making their decision. On the contrary, prosecutor directly requested the jury leave religion out of their decision making process:

> You know, what I don't understand is why we can't leave God out of this. I mean, the law does not talk about the Bible. The law does not talk about God. The law talks about aggravating circumstances and mitigating circumstances and it talks about the circumstances of the offense and it talks about the character and propensity of the defendant. But nowhere does it talk about the Bible. Nowhere does it talk about God.

*Cf. Jones v. Kemp*, 706 F.Supp. 1534, 1558-60 (N.D. Ga. 1989) (death sentence set aside where capital sentencing jury allowed to consider Bible). Consequently, it cannot be concluded the prosecutor's comments introduced passion, prejudice or any other arbitrary factor into the proceedings.

The record does not reveal any potential indicia of passion, prejudice, or arbitrariness. Defendant, a 33-year-old black male, killed three unarmed individuals, including a 13-year-old boy, immediately upon their arrival to his home, and received a sentence of death from a unanimous jury consisting of two black females, two white females, two black males, and six white males, during the selection of which no *Batson* challenge was asserted.[11] Thus, defendant fails to prove his allegations of either racism or references to religion in closing arguments contributed to the verdict.

### *Aggravating Circumstances*

As demonstrated by the jury's verdict during the guilt phase of the trial, the

---

[11] Notably, the State asserted a reverse *Batson* challenge, which the trial court denied ruling that the State failed to make a prima facie showing "that the peremptory challenges exercised by [defendant] were on the basis of race."

State presented constitutionally sufficient evidence to prove beyond a reasonable doubt that defendant killed each of the three victims when he had the specific intent to kill or to inflict great bodily harm upon more than one person, and that his actions were not justifiable in self-defense. La.C.Cr.P. art. 905.4(A)(4); *see Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) As discussed above, the record amply supports this determination. The State's evidence of defendant's motive and premeditation in the killings, his continuous firing of the semi-automatic rifle inside of the victims' vehicle, and his subsequent actions taken to distance himself from the shooting, overwhelmingly proved defendant had the specific intent to kill Jarquis Adams, and his two brothers, Jeremiah Adams and Gene Adams, when he acted with the specific intent to kill or inflict great bodily harm on more than one person. Hence, the jury's sentencing decision in this case does not appear to be arbitrary or capricious. *See State v. Roy*, 681 So.2d 1230, 1242 (La. 1996). Consequently, defendant's sentence of death is firmly grounded upon the jury's finding beyond a reasonable doubt that defendant, as he committed each of these murders, did so while he "knowingly created a risk of death or great bodily harm to more than one person." La.C.Cr.P. art. 905.4(A)(4).

### *Proportionality*

The federal Constitution does not require a proportionality review. *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). However, comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. *State v. Burrell*, 561 So.2d 692, 710 (La. 1990); *State v. Wille*, 559 So.2d 1321, 1341 (La. 1990).

According to the State, since 1976, 48 persons—excluding defendant—have been indicted for first-degree murder in Caddo Parish, of which 20 have been found to deserve a sentence of death by a jury. Of death sentences not reversed,

eight involved intent to kill more than one person.

A review of the capital verdicts from Caddo Parish does not suggest that Marcus Donte Reed received a disproportionately harsh sentence. As noted above, eight cases resulted in a death sentence when the defendant had the intent to kill more than one person. *See State v. Tucker*, 13-1631 (La. 9/1/15), 181 So.3d 590 (defendant shot his pregnant girlfriend three times, killing her and the unborn child); *State v. Dorsey*, 10-0216 (La. 9/7/11), 74 So.3d 603 (Dorsey tied a 79-year-old woman to a chair, ransacked her home, bludgeoned her 52-year-old son to death with sufficient force to cause his broken skull to lacerate his brain, set him on fire, and left the woman tied to a chair in her burning home); *State v. Holmes*, 06-2988 (La. 12/2/08), 5 So.3d 42 (defendant and her boyfriend forced their way into the home of 70-year-old Julian Brandon and 68-year-old Alice Brandon, shot Julian, then stabbed and slashed him to death, and robbed Alice before shooting her in the head); *State v. Edwards*, 97-1797 (La. 7/2/99), 750 So.2d 893 (Edwards and an accomplice shot and killed Victoria Kennedy and shot and beat Gerald Kennedy, who received multiple skull fractures but survived, while robbing them at their apartment); *State v. Cooks*, 97-0999 (La. 9/9/98), 720 So.2d 637 (Cooks along with four others entered a home in Shreveport to steal marijuana from the occupants and a struggle ensued and Cooks shot and killed one victim and also directed the shooting of two other surviving victims); *State v. Tyler*, 97-0338 (La. 9/9/98), 723 So.2d 939 (Tyler shot and killed the manager of a fast food restaurant in the course of an armed robbery, and he also shot two other employees in the head, but they survived the injuries); *State v. Davis*, 92-1623 (La. 5/23/94), 637 So.2d 1012 (Davis committed two separate murders in the course of two armed robberies); *State v. Code*, 91-0998 (La. 11/29/93), 627 So.2d 1373 (a vicious serial killer was convicted of brutally killing four people, including one whom he nearly decapitated and another whom he made sit in the blood of her murdered daughter

before being killed herself, and he was found to have killed four other people as well).

Here, it is appropriate for the Court to look beyond the First Judicial District Court and conduct a statewide proportionality review. *Cf. State v. Davis*, 92-1623, pp. 34-35 (La. 5/23/94), 637 So.2d 1012, 1030-31. Louisiana juries have not hesitated in imposing the death penalty in a variety of cases involving multiple deaths or when a defendant risks death or great harm to more than one person. *See State v. Scott*, 04-1312 (La. 1/19/06), 921 So.2d 904 (two female bank tellers shot during bank robbery; first-degree murder convictions affirmed, case remanded for hearing under *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)); *State v. Brown*, 03-0897 (La. 4/12/05), 907 So.2d 1 (couple kidnapped from their home, both shot and then found burned in their torched vehicle); *State v. Wessinger*, 98-1234 (La. 5/28/99), 736 So.2d 162 (ex-employee returned to restaurant, shot three employees and killed two); *State v. Robertson*, 97-0177 (La. 3/4/98), 712 So.2d 8 (couple stabbed to death in their home during an aggravated burglary); *State v. Baldwin*, 96-1660 (La. 12/12/97), 705 So.2d 1076 (defendant shot and killed his estranged wife and the three men who were with her at the time); *State v. Tart*, 93-0772 (La. 2/9/96), 672 So.2d 116 (defendant killed an elderly couple with a hunting knife during the commission of an aggravated burglary and armed robbery or simple robbery of the couple's jewelry store); *State v. Taylor*, 93-2201 (La. 2/28/96), 669 So.2d 364 (ex-employee returned to restaurant, killed one employee, and attempted to kill another); *State v. Sanders*, 93-0001 (La. 11/30/94), 648 So.2d 1272 (husband killed estranged wife and new boyfriend); *State v. Deboue*, 552 So.2d 355 (La. 1989) (defendant killed two children in an apartment he and his brother intended to burglarize).

Because this Court has overwhelmingly upheld death sentences in such cases and due to the horrific nature of defendant's brutal and senseless killing of

the three unarmed Adams brothers, we find the death sentence imposed in this case is not disproportionate.

## DECREE

For the reasons assigned herein, the defendant's conviction and death sentence are affirmed. This judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial court shall, upon receiving notice from this Court under La.C.Cr.P. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. Rev. Stat. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any State post-conviction proceedings, if appropriate, pursuant to its authority under La. Rev. Stat. 15:178; and (2) to litigate expeditiously the claims raised in that application, if filed in the state courts.

**AFFIRMED.**

SUPREME COURT OF LOUISIANA

No. 2014-KA-1980

STATE OF LOUISIANA

VERSUS

MARCUS DONTE REED

ON APPEAL
FROM THE FIRST JUDICIAL DISTRICT COURT,
FOR THE PARISH OF CADDO

Hughes, J., concurs in the result.